SWISS CONFEDERATION v. UNITED STATES.

No. 46239.

Court of Claims.

March 3, 1947.

John J. Wilson, of Washington, D. C., for plaintiff.

Kendall M. Barnes, of New York City, and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and MADDEN, JONES, LITTLETON, and WHITAKER, Judges.

WHITAKER, Judge.

The Swiss Confederation, a foreign nation, sues the United States for $64,589.26, alleging that this amount, added to the amount already paid it, is just compensation for the taking by the United States on November 5, 1941 of 283,188 gallons of toluol, the property of plaintiff.

Plaintiff filed claim therefor with the Board of Economic Warfare. This Board, sometime after April 20, 1942, determined that just compensation was $80,708.58, plus interest at 4 percent per annum as compensation for delay in payment. This was based upon a price of 28½ cents a gallon.

Plaintiff refused to consent to the award. Thereupon, in accordance with the Act of October 10, 1940, 54 Stat. 1090, 1091, 50 U.S.C.A.Appendix, §§ 711–713, there was paid to it on July 22, 1944 one-half of the award, to wit, $43,022.18. Plaintiff's suit is to recover the additional amount to which it claims it is entitled as just compensation for the property taken.

A preliminary question is presented as to the right of a foreign government to sue in this court.

Defendant relies upon the provisions of section 155 of the Judicial Code, sec. 261 of 28 U.S.C.A. This section accords the right to sue in the Court of Claims to aliens whose government accords to citizens of the United States the right to prosecute claims against their government in its courts. It argues that since foreign governments are not therein given the right to sue, they are to be excluded, under the maxim expressio unius est exclusio alterius.

Under section 145 of the Judicial Code, sec. 250 of 28 U.S.C.A., this court is given jurisdiction of "all claims (except for pensions) founded upon the Constitution of the United States or any law of Congress * * * in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable * * *."

There is to be found therein no limitation on the right of any party to sue because of his nationality, corporate status, or for any other reason. Neither foreign governments nor their subjects are excepted. See Russian Volunteer Fleet v. United States, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473.

Section 145 was based upon Revised Statutes section 1059, which in turn was based upon the Acts of February 24, 1855, 10 Stat. 612; the Act of March 3, 1863, 12 Stat. 765; and the Act of May 9, 1866, 14 Stat. 44. None of these Acts contained any limitation on the right to sue because of the status of the person holding the claim. However, by the Act of July 27, 1868, 15 Stat. 243, carried into the Judicial Code as section 155, it was provided that: "Aliens who are citizens or subjects of any Government which accords to citizens of the United States the right to prosecute claims against such Government in its courts, shall have the privilege of prosecuting claims against the United States in the Court of Claims, whereof such court, by reason of their subject matter and character, might take jurisdiction."

This statute, it will be seen, was directed at the citizens or subjects of foreign governments; no mention was made of a foreign government itself and, hence, under the rule relied on by defendant, a foreign government is not subject to the limitation imposed by it. So far as we know, Congress has at no time placed any restriction upon the power of a foreign government to sue in our courts on that character of claims enumerated in section 145 of the Judicial Code.

We know of no reason why Congress should have done so. A foreign government might be unwilling to submit itself to the jurisdiction of the courts of the United States, but if it is willing to do so, we can conceive of no reason why Congress

should have intended to prohibit a court established by it from giving to the foreign government the same redress which would be accorded to any other litigant.

Berger et al. v. United States, 36 Ct.Cl. 243, 246, is not to the contrary. Jurisdiction there was refused, not because the claimant was a foreign government, but because the claim did not come within the class of those over which the court was given jurisdiction by section 145 of the Judicial Code. It was a claim for damages for the capture of a British vessel by an American warship during the war with Spain.

■ But whether or not we are correct in the foregoing, we are clearly of the opinion that the Swiss government is entitled to sue under the provisions of the Act of October 10, 1940, c. 836, sec. 2, 54 Stat. 1090, 1091. This statute provides that the owner of property requisitioned by the Government "shall be entitled to sue the United States for such additional sum as, when added to the sum already received by such owner, such owner may consider fair and just compensation for such article or material, in the manner provided by sections 41 (20) and 250, Title 28, of the Code of Laws of the United States of America * * *." No limitation whatever is placed upon the character or status of the owner authorized to sue.

We hold that under this statute and under the authority of Russian Volunteer Fleet v. United States, supra, the Swiss government is entitled to sue. In the case cited the Supreme Court had before it the right of the Russian Volunteer Fleet to bring suit for the requisition of its property under the Act of June 15, 1917, 40 Stat. 183, which, insofar as is material, is of the same import as the above-quoted act. The contention was there made, as here, that plaintiff was prohibited from suing by section 155 of the Judicial Code. The Supreme Court said that the Act of June 15, 1917 placed no such limitation upon the right to sue as was contained in section 155 of the Judicial Code, and that the Russian Volunteer Fleet was entitled to sue, notwithstanding its provisions. We think this case is determinative of the issue presented in the case at bar.

■ There remains the question of just compensation. The award of the Board of Economic Warfare was based upon the prevailing price at which toluol was being sold at the time of the requisition to domestic users. Plaintiff, however, insists that the price which it was necessary to pay for toluol to be exported was substantially in excess of this amount, and that it is entitled to recover the export price.

If the export price was in fact greater than the price to domestic users, plaintiff is entitled to recover this price, since it had purchased the toluol for export. United States v. New River Collieries Co., 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014; United States v. Miller et al., 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55; United States v. Causby et al., 328 U.S. 256, 66 S.Ct. 1062. The evidence clearly shows that at the time in question the export price was substantially in excess of the domestic price.

The principal producers of toluol were the steel mills. These people had no facilities for storing it and so made yearly contracts for the sale of it to domestic users, to be shipped as produced. Practically all of that produced was thus sold. Hence, when toluol was sought for export purposes it could be obtained only where the domestic demand for some reason left a balance on the hands of the producers, or where it could be purchased from domestic users. Because of this limited supply, the price for export was higher than that at which it was sold to domestic users.

Until shortly prior to the outbreak of the war in Europe in 1939 there had been some differential between the price of toluol for export and for domestic use, but the difference was not great. The great demand for export toluol began in the latter part of 1938. This demand was created by the imminence of war and by the fact that toluol was used in the manufacture of TNT. Between the latter part of 1939 and the middle of 1940 prices paid for export toluol ranged from 35 cents to 60 cents a gallon, or more. However, shortly after the war started in September 1939 the British Government established what was called the navicert system, under which the British Embassy issued a certificate to an exporter, the pos-

session of which permitted clearance of the goods through the British blockade. Practically all steamship companies required such a certificate before accepting goods for transport through the blockade. Then on July 2, 1940, 50 U.S.C.A.Appendix § 701, the Congress of the United States passed an Act requiring a license for the export of certain materials, including toluol. As a result of these two things the demand for export toluol greatly decreased. For instance, in 1940 the United States exported 8,209,058 gallons of toluol, and in 1941 only 3,308,718 gallons. Of the 3,308,718 gallons exported in 1941, 2,313,255 gallons thereof were exported to Great Britain and her dominions. The only other countries in the European area to which any exports were made in 1941 were Russia and Sweden. In that year 316,132 gallons were exported to Sweden, and 568,529 gallons were exported to Russia.

During the latter part of 1941 there were but few sales for export. Those of anything like comparable size to the amount requisitioned were at about 35 cents a gallon. Plaintiff made its purchase on June 30, 1941, at 34 cents. In August the Amtorg Trading Company, which was wholly owned by the Russian Government, purchased 150,000 or 160,000 gallons at 35 cents, and a little later an additional amount at the same price. Along about the same time the Swedish Government contracted to purchase some at the same price.

These sales afford the best evidence available of the market price for export toluol at about the time of the requisition.

We do not think that the price paid by the British Government for toluol, which was less than 35 cents, determines the market value of toluol for export. The British Purchasing Commission was set up in this country shortly after the war broke out in Europe in 1939, and it immediately began entering into contracts for the purchase of toluol either for export or for use in this country in manufacturing TNT for the British Government. They contracted for practically all that was available for export. Indeed, a great deal was withdrawn from domestic use in order to supply the British needs. This further withdrew from the market the available supply of toluol and made it additionally expensive for any other foreign purchaser to obtain it.

But defendant says plaintiff is not entitled to the export price for toluol because it had sought in vain to obtain a navicert from the British Embassy and an export license from our State Department for the exportation of all it had purchased; and, hence, it was unable to export all it had purchased; but it does not follow that it is not entitled to the export price. It was permitted to export 31,406 gallons on November 6, 1941, and, even if we take it for granted that it would not have been permitted to export any more, still, except for the requisition, it is reasonable to suppose that it could have disposed of the balance at the export price to the Amtorg Trading Company or the Swedish Government, who could get navicerts and export licenses.

Plaintiff is not entitled to recover the inflated prices existing in the early part of 1940. The establishment of the navicert system and the requirement of an export license had brought those prices down. For these acts the defendant, of course, is not liable. It is not liable, of course, for the acts of the British Government in requiring these navicerts; nor is it liable for the act of this government in requiring a license for export, since this was an act done in its sovereign capacity, in the interest of national defense. Horowitz v. United States, 58 Ct.Cl. 189; Id., 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736; Gothwaite v. United States, 102 Ct.Cl. 400; J. F. Barbour & Sons v. United States, 63 F.Supp. 349, 104 Ct.Cl. 360.

It is not reasonable to suppose that plaintiff would have kept the toluol in storage until after the removal of restrictions on its export, because by that time the demand for it would have largely disappeared. Hence, the principle of the case of Kaiser et al. v. United States, 69 F.Supp. 588, in this court, has no application to the facts of this case.

█ We are of the opinion that 35 cents a gallon was the fair market price for export toluol. From this there is to be deducted, however, two cents freight, which, according to the custom of the trade, sellers agreed to pay. We have no reason to think

any distinction was made in this respect between domestic and export toluol. In fact, the testimony of the witness Schwartz indicates that none was made.

Judgment will be rendered in plaintiff's favor against the United States for $53,-097.75, plus interest at four percent from the date of the taking on November 5, 1941, not as interest, but as a part of just compensation. It is so ordered.

MADDEN, JONES, and LITTLETON, Judges, concur.

WHALEY, Chief Justice, took no part in the decision of this case.