Whitaker, Judge,
delivered the opinion of the court:
In view of the Supreme Court’s decision of March 27,1950, in the case of United States v. Commodities Trading Corpora *790 tion, et al., 389 U. S. 121, the defendant’s motion for a new trial in the instant case must be allowed. In the Commodities case* the Supreme Court held that in the absence of unusual circumstances the ceiling price determined the measure of just compensation for the requisitioning of property,
.In the instant case we allowed plaintiff just compensation based upon 54.79 cents á pound for the 54,180 pounds of tin which defendant requisitioned. However, the ceiling price for tin to be exported was 53 cents a pound. It is, therefore, necessary that the conclusion of law heretofore filed on February 6, 1950, be vacated and withdrawn. In lieu thereof, judgment is now entered for plaintiff in the sum of fourteen thousand three hundred two dollars and eighty-seven cents ($14,302.87), plus an amount to compensate plaintiff for the delay in payment computed on twenty-eight thousand seven hundred fifteen dollars and forty cents ($28,715.40) from September 10,1942, to June 10,1943, at four (4) percent per annum, and plus an additional amount computed at the same rate on fourteen thousand six hundred twenty-eight dollars and sixty cents ($14,628.60) from May 2,1944, until paid. It is so ordered.
Howell, Judge; MaddeN, Judge; LittletoN, Judge; and Jones, Chief Judge, concur.

Findings of Fact and Of inion

" On February 6, 1950, the court made special findings of fact, with an opinion by Judge Whitaker, as set forth below, as follows:
1. Plaintiff was incorporated under and pursuant to the laws of the Republic of Argentina on or about June 6, 1939, and continued to exist as a corporation organized and existing under such laws until at least March 13,1946. Plaintiff’s principal place of business is located in Buenos Aires, Argentina ; it maintained no office in the United States.
2. Under the laws of Argentina, citizens of the United States are accorded the right to prosecute claims against the Government of Argentina in the courts of that country..
3.'-Pursuant to Section 6 of the act of July 2, 1940 (54 Stat. 712) entitled, “An Act to Expedite the Strengthening of *791 the National Defense,” the President, by Proclamation No. 2413 issued on July 2,1940, determined that it was necessary in the interest of national defense that various materials, products and machines, including tin and products containing tin, not be exported from the United States except when ...authorized by a license issued by the Secretary of State.
Regulations governing the exportation of such articles were issued by the President the same day, and on May 6, 1941, these regulations were amended to require such a license for the shipment from this country of property here in transit from one foreign country to another.
The above proclamation and regulations were published contemporaneously in the Federal Register.
4. On or about November 15,1941, plaintiff caused 982 slabs of refined Grade A tin to be purchased for its account from Henry Waugh & Company, Ltd., of Singapore, payment to the Waugh Company being made by means of a letter of credit opened for plaintiff with the Swiss Bank Corporation of England. Twenty-seven metric tons of tin were purr chased at a price of £323.15.0 per 1,000 kilos, c. i. f. (cost, insurance, and freight) Buenos Aires, and the balance consisting of 18.7 metric tons at a price of £283.7.1 per 1,000 kilos, also c. i. f. Buenos Aires. These prices were equal to 59.25 cents a pound and 51.86 cents a pound, respectively, or an average price for the entire quantity of tin so purchased of 56.23 cents a pound.[1]
5. All the tin so purchased was shipped from Singapore to the plaintiff in Buenos Aires, Argentina, via New York City, on the steamer Lillian Luckenbach, The bill of lading dated at Singapore November 15, 1941 and covering the shipment read, “From Singapore to Buenos Aire's Via New York,” and the Lillian Luckenbach would in the normal course of business have unloaded the tin in New York for reshipment to Buenos Aires on another vessel.
6. Because of a marine disaster, this tin was. unloaded from the Lillian Luckenbach at Surabaya, Dutch East Indies. A portion of it, comprising 523 slabs, was subsequently loaded on the steamer Collingsworth, which arrived in the Port of *792 New York on May 4, 1942, at which, point she unloaded the 523 slabs of tin weighing a total of 54,180 pounds.
7. This tin remained on the dock where it had been unloaded, from May 4 to June 2 and 3, 1942, on which dates it was delivered to Bowne-Morton Stores; Inc., 611 Smith Street, Brooklyn, New York, for storage under General Order 13292 issued by the United States Customs Service. This action was taken pursuant to Section 490 of the Tariff Act of 1930, as amended (19 U. S. C. 1490) due to the failure of the owner to make any entry of it. Such entry could be an entry for consumption, an entry for reexport, etc. While material was so stored under general order, the owner retained the same rights with respect to it as he possessed while it was lying on the pier,-that is, he could enter' it for consumption upon paying the appropriate duties, could enter it for reexport, etc. The only difference was that, if no affirmative action to enter the goods should be taken by the owner for a period of one year, the statute (19 U. S. C. 1491) provided for the sale of such merchandise, the proceeds being applied in payment of the duties and storage charges.
■. 8. Shortly after this tin was unloaded from the Collings-worth,- plaintiff requested the assistance of the New York Trust Company in securing its reexportation to Argentina. That company attempted to make an intransit entry of the tin through Customs, to permit its movement from one pier to another for reexportation, and then learned that an export license would be required before the tin could be shipped to Argentina.
Plaintiff then sought the assistance of Mercantile Metal and Ore Corporation, import and export merchants in New York City. That company, on plaintiff’s behalf, filed two separate applications for export license to Argentina for portions of this tin, one on August 18 and the other on August 31, 1942. Each of these applications covered 22,000 pounds, or a total of 44,000 pounds out of the 54,180 pounds here involved. Each of these applications was rejected on the ground that the proposed exportation would be contrary to the interest of the national defense.
9. On or about September 10, 1942, the defendant, acting through the Navy Department under and pursuant to Navy *793 Requisition No. 70, requisitioned and took possession of the 523 slabs of tin weighing 54,180 pounds, being then in storage at Bowne-Morton Stores, Inc. Thereafter and on or about September 18, 1942, this tin was released from the bonded warehouse and entered through Customs by defendant.
10. On March 6, 1943, plaintiff filed with the Navy Department a claim for fair and just compensation, which claim was based upon the mistaken belief that the tin requisitioned weighed 53,783 pounds instead of 54,180 pounds which were actually requisitioned. A copy of this claim, together with copies of certain documents which were annexed thereto, forms a part of a stipulation entered into by the parties under date of October 9, 1946. That portion of the stipulation referring specifically to this claim contains the following phraseology:
Defendant does not, by this stipulation, admit the truth or accuracy of any of the statements or claims made in such petition, admitting only that it is a copy of the document which was filed.
11. The plaintiff’s above-mentioned claim, which was for the sum of $97,191.04, was based on the alleged local market price of tin in Argentina of 17 pesos per kilo, as of October 1942, and an exchange rate of 23.75 cents per peso. These figures when converted give a value of approximately $1.83 per pound.
This claim was as follows:
Value of 53,783 lbs. of tin in Argentina at' approximately $1.83 per lb^.-$98,497.18
Less alleged Argentine import duties and taxes and unloading expenses at approximately 3 cents per lb_ 1,541.49
53,783 lbs. of tin at approximately $1.80 per lb- 96,955. 69
Plus alleged storage charges at New York paid by plaintiff to Bowne-Morton Stores, Inc- 235.35
Total_ 97,191.04
12.Plaintiff’s petition in the present case is calculated upon the same basic values given above with the exception that it is based upon the 54,180 pounds of tin requisitioned. Plaintiff sues for the estimated market value of this tin in Buenos Aires, Argentina, at the time of probable delivery *794 of the tin, less the import duties and taxes imposable by Argentina and the costs of unloading, plus cost of storage in New York. The figure set forth in the petition is $97,983.44, which, less New York storage costs of $209.20 paid by the plaintiff, gives an approximate value per pound of $1.804.[2]
The only data in this case relating to the Argentine import duties and taxes and unloading costs are contained as an estimate in a letter of October 17, 1942, from Capello & Cia, customs brokers at Buenos Aires, Argentina, which letter was attached to and formed a part of plaintiff’s claim on the Navy Department, referred to in Finding 10.
13. On April 9, 1943, the defendant, acting through the Navy Department, made what it termed a “preliminary determination” of the value of the tin which was requisitioned, this determination being in the amount of $28,173.60, plus interest at 4 percent per annum to the date, of the determination. The amount of interest was $651.46, making a total award or determination of $28,825.06. Prompt notice of the preliminary determination was given to plaintiff.
The principal amount of such determination, $28,173.60, is equal to 52 cents a pound for the tin that was requisitioned, and was stated by the Chief of the Claims Unit, Navy Order Section, to whom had been delegated the duty of making such determinations, to be:
* * * based upon a certificate relating to the domestic market, price of Straits Tin on September 10, 1942? the date of taking, issued by the Bureau of Labor Statistics of the United States Department of Labor. The above mentioned market value does not exceed the ceiling prices established by the Office of Price Administration. , .
14. Plaintiff requested and received from the Navy Department numerous extensions of time to file objections to the preliminary determination, agreeing as a condition to an *795 extension from June 10 to September 10, 1943, that no interest or additional compensation for delay in payment should be allowed for the period of such extension.
On September 9, 1943, plaintiff filed a written objection to the preliminary determination on the ground that the determination did not constitute fair and just compensation for the tin requisitioned.
15. On May 2, 1944, the Navy Department paid to the plaintiff the sum of $14,412.53, this being 50 percent of the determination made by the Navy Department. This payment was made pursuant to a written stipulation dated April 14, 1944, in which the plaintiff accepted 50 percent of the amount determined, subject to the right of plaintiff to assert a claim against the United States for fair and just compensation.
The delay in making such payment, from about September 9, 1943, to May 2, 1944, was occasioned by plaintiff’s failure to prove payment of certain transportation and storage charges, for which claim had been filed with the Navy Department, and such delay was not occasioned by any act or default of the Navy Department.
16. On December 17,1941, the Office of Production Management, acting pursuant to the authority granted by the act of June 28, 1940 (54 Stat. 676), as amended by the act of May 31, 1941 (55 Stat. 236), issued an order known as General Preference Order M-43 to conserve the supply and direct the distribution of tin. This order provided in part as follows:
* * * * *
(b) Provisions as to future imports (not inekidmg tin afloat). — Unless otherwise specifically authorized by the Director of Priorities, no person shall:
(1) Fabricate or convert any tin imported after the effective date of this order into the United States by him either directly or indirectly; or
(2) Sell, transfer or otherwise dispose of any such tin (excluding tin afloat to the United States at the date of this order) except by sale thereof to the Metals Eeserve Company or to any other governmental department, agency or corporation.
(c) Special directions for disposition of tin afloat.;— No person shall receive, sell, transfer or otherwise dis *796 pose of any tin. afloat at the date of this order except in accordance with the specific directions of the Director of Priorities. Any person who knows, or has reason to believe that a shipment of tin is afloat to him or for his account, when this order takes effect, shall immediately notify the Tin, Lead and Tlmenite Branch of the Office of Production Management of the point of origin, destination, kind, quantity and value of such shipment, and shall furnish such other pertinent information as the Office of Production Management may request.
*****
. (8). Basis of allocations. — Any allocations and specific directions will be made to insure satisfaction of all defense requirements of the United States, both direct and indirect, and they may be made in the discretion of the Director of Priorities without regard to any preference ratings assigned to particular contracts or purchase orders. The Director may also take into consideration the possible dislocation of labor and the necessity of keeping a plant in operation so that it may be able to fulfill defense orders and essential civilian requirements.
This order was amended on June 17, 1942, by the War Production Board, the successor to the Office of Production Management, to provide in material part as follows:
(c) Restrictions on deliveries. — (1) Hereafter, no person shall deliver or accept delivery of tin without the specific authorization of the Director of Industry Operations: Provided, however, That in the absence of a contrary direction by the Director of Industry Operations, tin may be delivered without specific authorization :
(i) To the Metals Reserve Company or to any other Corporation organized under Section 5 (d) of the Reconstruction Finance Corporation Act as amended (15 U. S. C., Section 606 (b)), or to any duly authorized agent of any such Corporation.
(ii) By any distributor to his regular customers in lots of three long tons or less up to but not exceeding a total of five long tons to any one customer in the same calendar month: Provided, That the aggregate of such deliveries which any person may receive from all distributors pursuant to this authorization shall in no event exceed five long tons in any one calendar month:
*****
(d) Allocations. — The Director of Industry Operations will from time to time allocate the supply of tin, *797 including all tin released by the Metals Reserve Company, and issue specific directions as to the source, destination, and amount of tin to be delivered or acquired. The Director may also specifically direct the purposes and end products for which any person may convert, process or fabricate tin.
17. On August 15,1941, the Ofiice of Price Administration and Civilian Supply issued Price Schedule No. 17 establishing maximum prices for pig tin and other forms of tin. On February 21, 1942, this regulation was reissued by the Office of Price Administration as Revised Price Schedule No. 17 under and pursuant to the Emergency Price Control Act of 1942. So far as here material, this price schedule read as follows:
§ 1333.1 Maximum, prices for pig tin. — On and after August 16,1941, regardless of the terms of any contract of sale or purchase, or other commitment, except as provided in § 1333.4 hereof, no person shall sell, offer to sell, deliver or transfer, pig tin, and no person shall buy, offer to buy, or accept delivery of pig tin at prices higher than the maximum prices set forth in Appendix A hereof, incorporated herein as § 1333.10.
*****
§ 1333.10. Appendix A: Maximum prices for pig tin— (a) Maximum prices for standard grades of pig tin.

Maximum price W'dae (pw pound)

A. 99.80% or higher percentage of purity, meeting specifications set forth in “Specifications and Proposals for Supplies, No. S-14,” issued December 15, . 1939, by the U. S. Treasury Department, Procurement Division, except that pig tin of this grade need not be free of scrap and remelted metal_ $0. 52
B. 99.75% to 99.79% pure, inclusive; and 99.80% or higher percentage of purity which does not otherwise meet the specifications of Grade A_ . 51625
O. Cornish Refined_ .51625
D. 99.00% to 99.74% pure, inclusive- . 51125
E. Below 99% pure_.51 for tin content
(b) Differentials for freight rates — The above maximum prices are, in the case of foreign pig tin, ex dock or store, Port of New York, and, in the case of domestic pig tin, ex producer’s plant. * * *
On March 20, 1942, Revised Price Schedule No. 17 was amended by inserting in Appendix A thereto provisions *798 relating to maximum prices upon export sales. So far as here material, the amendment read as follows:
(d) Differentials for export sales. (1) On all export sales, whether from dock, store, steamer with transshipment privileges, free port, or any other point, an amount not exceeding that set forth in the following table may be added by the exporter to the maximum prices set forth above:
... There may he added.
... For sales of pig tin in lots of: to the maximum price
11,200 lbs. or more- If, per lb.
2,240 to 11,199 lbs_1%0 per lb.
Less than 2,240 lbs- 2‡ per lb.
This price schedule, as so amended, was still in full force and effect on September 10,1942.
18. Metals Eeserve Company, a corporation organized under Section 5 (d) of the Eeconstruction Finance Corporation Act, as amended (15 U. S. C., 606 (b)), began purchasing tin for a national defense stockpile during the year 1940. In 1940 it made an open offer to purchase any tin that might be tendered to it at the price of 50 cents a pound for Grade A tin, delivered in the United States.
Between 1940 and the early part of 1942 Metals Eeserve Company purchased approximately 43,500 gross tons at this price. During the year 1942 and during succeeding years through 1945 Metals Eeserve Company purchased only negligible quantities of tin in the United States. During 1942 it did purchase tin abroad for delivery to the United States, acquiring some 7,185 gross tons in February 1942 at a price of 50 cents a pound c. i. f. New York for Grade A tin, and contracting for an additional 16,000 tons from the Belgian Congo in September 1942 at 54.79 cents a pound, also c. i. f. New York, for Grade A tin¡
19. Metals Eeserve Company began selling tin from its stockpile in January 1942, establishing at that time a selling price of 52 cents a pound for Grade A tin, which price it maintained without change to December 1, 1946. During 1942 Metals Eeserve Company sold approximately 16,000 gross tons of tin at this price, and was in a position to sell tin to every holder of a priority or allocation for tin from the War Production Board. Sales were made at the same scale of prices to every holder of a priority or allocation. *799 Metals Reserve Company was able to maintain its selling price at 52 cents a pound despite the later increase in the cost of tin to it by reason of the substantial quantities that it had purchased at earlier dates at 50 cents a pound.
20. The plaintiff paid the warehouse storage charges incurred between about June 1, 1942, when the tin was placed in storage by the Customs House authorities, and September 10,1942, in the sum of $209.20.
21. As set forth in Finding 18, the Metals Reserve Company during September 1942, contracted for 16,000 tons of Grade A foreign tin c. i. f. New York, at 54.79 cents per pound.
The fair and reasonable value of the 54,180 pounds of Grade A tin, requisitioned by the Government from plaintiff on September 10,1942, was 54.79 cents per pound.
The court decided that the plaintiff was entitled to recover.
WhitakeR, Judge,
on February 6, 1950, delivered the opinion of the court:
Plaintiff is a corporation organized under the laws of the Republic of Argentina and doing business in that country. It has no place of business in.the United States. It sues for just compensation for some tin requisitioned from it by defendant.
On or about November 15, 1941, plaintiff purchased from Henry Waugh & Company, Ltd., of Singapore, 45.7 metric tons of tin at an average price of 56.23 cents a pound. A portion of this tin, 54,180 pounds thereof, was loaded on the 88 Lillian Luchenbach for shipment to Buenos Aires, via New York City. On account of a marine disaster this tin was unloaded at Surabaya, Dutch East Indies, and was reloaded on the 88 Collingsworth, which arrived in the Port of New York on May 4,1942.
The tin was unloaded for transshipment to Buenos Aires in another vessel. It remained on the docks from May 4 to June 2 and 3, 1942, when it was stored with Bowne-Morton Stores, Inc., in Brooklyn.
At the time of the arrival of this tin there was in effect General Preference Order M-43, which had been issued under *800 the authority of the Act of June 28, 1940 (54 Stat. 676), as amended by the Act of May 31, 1941 (55 Stat. 236). This order provided in part:
(b) Provisions as to future imports (not including tin afloat). — Unless otherwise specifically authorized by the Director of Priorities, no person shall:
(1) Fabricate or convert any tin imported after the effective date of this order into the United States by him either directly or indirectly; or
(2) Sell, transfer or otherwise dispose of any such tin (excluding tin afloat to the United States at the date of this order) except by sale thereof to the Metals Reserve Company or to any other governmental department, agency or corporation.
There was also in effect at the date of the arrival of this tin in this country regulations requiring a license for the shipment from this country of property in transit from one foreign country to another.
The validity of such a regulation was upheld in Neumaticos Goodyear, S. A. v. United States, 109 C. Cls. 535, certiorari denied, 334 U. S. 838; and in other cases.
Faced with this situation, plaintiff, through two different agencies, sought to secure permission to reship this tin to Argentina, but its applications to do so were rejected on the ground that the proposed exportation would be contrary to the interests of the national defense. About ten days after the rejection of these applications the Navy Department requisitioned the tin.
• Plaintiff filed a claim for just compensation in the sum of $97,191.04. This claim was allowed in the sum of $28,173.60, plus an additional sum of $651.46 for delay in payment. The amount of $28,173.60 was computed at 52 cents a pound, the price at which tin was being sold by the Metals Reserve Company.
Plaintiff claims that it is entitled to the price it could have received for this tin in Argentina. This claim cannot be sustained under prior decisions of this court. Neumáticos Goodyear, 8. A. v. United States, supra. The regulations forbidding its transshipment were a valid exercise of the war powers of this country. Because of them, plaintiff was unable to deliver the tin to Argentina and, therefore, of *801 course it was not entitled to the price it could have received for it in that country.
Regulations prohibiting its transshipment were issued pursuant to the sovereign powers of this country and plaintiff is not entitled to recover any damages it may have suffered in consequence thereof. Horowitz v. United States, 267 U. S. 458; Omnia Commercial Co., Inc., v. United States, 261 U. S. 502; Neumaticos Goodyear, S. A. v. United States, supra, and other cases there cited.
Plaintiff says that we have held that where merchandise is purchased for export that the exporter is entitled to the export price, relying on United States v. New River Collieries Co., 262 U. S. 341, and our decisions in Swiss Confederation v. United States, 108 C. Cls. 388, cert. denied 332 U. S. 815; Foreign Trade Management Company v. United States, 110 C. Cls. 23, cert. denied 334 U. S. 831; and other cases. It is entitled to the export price, hut this means the price being paid in this country for goods to be exported, and not the price which could have been secured in the country of its destination. Just compensation is to be determined as of the time and place of the taking. United States v. New River Collieries Co., 262 U. S. 341; United States v. Miller, 317 U. S. 369; United States v. Powelson, 319 U. S. 266. The place of the taking was New York City.
Nor is it shown that the export price was any higher than the domestic price, except that Revised Price Schedule No. 17 of the Office of Price Administration allowed an addition to the domestic price of 1 cent per pound for the sales for export of tin in the quantity which plaintiff had for export.
The Metals Reserve Company had established a ceiling price- of 52 cents a pound for tin of the same grade as plaintiff’s tin, and during the year 1942 it sold approximately 16,000 tons of tin at this price, and it was in position to supply tin to every holder of a priority or allocation for tin from the War Production Board. Defendant says that this determines the limit of the amount the plaintiff is entitled to recover. The payment made to it was on this basis.
In Neumaticos Goodyear, S. A. v. United States, supra, and in Fabrica Uruguaya de Neumaticos, S. A. v. United States, 114 C. Cls. 76; 84 F. Supp. 745, we rejected the Gov *802 ernment’s contention that plaintiff was entitled to recover no more than the price at which the Rubber Reserve was selling rubber to consumers in this country.
The Commissioner has found that 54.79 cents a pound is just compensation. He bases this on the fact that the Metals Reserve Company contracted to pay this sum for tin which it purchased in the Belgian Congo at just about the same time plaintiff’s tin was requisitioned. It had purchased it at this price c. i. f. New York.
We are of the opinion that this is the best measure of just compensation. Plaintiff would have been able to secure this sum for its tin if it had been permitted to sell it. As we have said many times before, the Government had the undoubted right to prohibit plaintiff from selling its tin at any price greater than that fixed, but it did not have the right to place this limit upon the amount it was required to pay plaintiff when it requisitioned its property. Under the Constitution plaintiff is entitled to just compensation, and neither Congress nor an administrative agéncy has the right to say in advance of a requisition that so much and no more shall be paid to a person whose property is taken, unless this amount justly compensates the owner for the taking of it. The sum that does justly compensate the owner is a matter for judicial determination. Monongahela Navigation Co. v. United States, 148 U. S. 312; United States v. New River Collieries Co., 262 U. S. 341; Davis v. Newton Coal Co., 267 U. S. 292, 301.
The Supreme Court of Pennsylvania in Newton Coal Co. v. Davis, 281 Pa. 74, 126 Atlantic, 192, which was affirmed by the Supreme Court in Davis v. Newton Coal Co., 267 U. S. 292, quoting from National City Bark v. United States, 275 F. 855, 860, expressed the rule succinctly:
The government, as a war measure, under the exercise of governmental powers, may fix prices, either directly or by government regulations, necessarily reducing the prices; but this does not authorize it to acquire the property in invitvm at.such reduced prices.
The Government had to pay 54.79 cents a pound for tin which it purchased at just about the time of the requisition. If it had to pay so much in the open market, it seems only *803 just that it should pay plaintiff an equal amount when it takes its property against its will.
Just compensation for the 54,180 pounds of tin requisitioned amounts, at this price, to $29,685.22. To this amount there is to be added an amount to compensate plaintiff for the delay in payment, computed at 4 percent per annum from September 10,1942, the date of the taking, to June 10, Í943. No amount has been computed for delay in payment from June 10, 1943, to May 2, 1944, the date of a partial payment, because the delay between these dates was plaintiff’s fault. On May 2, 1944, plaintiff was paid the sum of $14,412.53. This amount is to be deducted from the amount found above, and on the balance, $15,272.69, the plaintiff is entitled to an additional sum computed at 4 percent per annum from May 2,1944, to the date of payment. Judgment will be entered accordingly.
. Howell, Judge; Littleton, Judge; and Jones, Chief Judge, concur.

 Based upon a sterling exchange rate of $4.035 as published in the Federal Reserve Bulletin and on the basis of a kilo being equal to 2.20462 pounds.

 Plaintiff has attempted to establish a market price of tin of 17 pesos- per kilo, equivalent to approximately $1.83 per pound, existent in Argentina on or about the date of the requisition. This is based upon the testimony of six witnesses which was taken in Argentina by interrogatories. The defendant objects to the testimony therein set forth both as to lack of competence and immateriality. As the market value of tin in Argentina is immaterial to the present issue no findings have been made with respect to such evidence. See Neumaticos Goodyear S. A. v. The United States, 109 C. Cls. 535.