## ILLINOIS PURE ALUMINUM CO. v. UNITED STATES.

### No. 46084.

Court of Claims.

Oct. 7, 1946.

Ernest H. Oliver, of Washington, D. C. (Moyle and Wanlass, of Washington, D. C., and Poppenhusen, Johnston, Thompson and Raymond, of Chicago, Ill., on the brief), for plaintiff.

Armistead B. Rood, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

JONES, Judge.

This suit involves the proper measure and amount of compensation to be paid to plaintiff for its stocks of aluminum materials requisitioned and taken by the defendant on May 20, 1942.

For many years plaintiff had been engaged in the business of manufacturing aluminum cooking utensils. With the outbreak of the war in Europe the need for aluminum greatly increased. Effort was made to increase the production of aluminum, and also orders were entered having for their purpose the conservation of the available supply.

After the entry of the United States into the war, the need for aluminum was still further increased, and the shortages became much more acute.

In a series of orders the War Production Board gradually limited the use of aluminum, finally throwing a curtain of steel around its disposition so that its use was practically limited to war purposes.

At the time of the requisition, May 20, 1942, the plaintiff had stock holdings amounting to 146,048 pounds of aluminum.

On February 23, 1942, the War Production Board sent out letters to manufacturers who used aluminum, requiring a report from them of stocks on hand. The plaintiff filed a report showing its stocks consisting of sheets, circles, coils, tubing and rivets of various sizes and gauges. Plaintiff had purchased this aluminum cut to shapes and ready for use in manufacturing cooking utensils. It was new, bright finish, fabricated aluminum. None of it was scrap, obsolete, damaged, or defective material.

This letter, which was signed by J. S. Knowlton as Director of Industry Operations, stated that all aluminum throughout the country was needed for war purposes. It contained an offer of purchase on the basis of a price list which is set out in detail in finding 10. Ten of the holders of aluminum stocks (including plaintiff) declined to sell at the price named in the letter, claiming that it was insufficient to cover either the cost or value of stocks in the form and finish such stocks were held by them.

On May 20, 1942, defendant, acting pursuant to the powers conferred by the Act of October 16, 1941, 55 Stat. 742, 50 U.S.C.A.Appendix, § 721 et seq., as amended, requisitioned and took possession of the entire inventory. It removed the property from plaintiff's storeroom and dumped it into freight cars, thereby damaging it in such a way as to preclude any possibility of its ever being used again "as is." It was treated as "Idle Inventory" by virtue of the aluminum conservation order of the defendant which had defined practically all aluminum as scrap aluminum for remelting purposes.

Aluminum is not always purchased by manufacturers on the basis of averages or bulk quantities. It, like many other materials, is frequently purchased on grades, qualities, and for specific purposes. Its values in varying forms differ widely. This is true of many of the finer materials. A manufacturer of fine watches might have on hand some highly tempered precision springs. The Government would have the right in wartime to requisition them for any essential war purpose, but no one would claim the right to class them as ordinary iron or steel, dump them into a truck with scrap material for remelting purposes, and pay for them on the basis of average steel, regardless of their cost, finish, or value to the holder. On the other hand, we do not think plaintiff can justly claim a value that would have prevailed had no wartime regulations or controls existed or been necessary.

Essential regulations and controls in wartime have been repeatedly approved. Bowles v. Willingham, 321 U.S. 503, 517, 64 S.Ct. 641, 88 L.Ed. 892; United States v. Delano Park Homes, 2 Cir., 146 F.2d 473, 474. Regulations, priorities and controls are vital in wartime. These wartime rules necessarily affect values. Had the plaintiff's property not been requisitioned, it would have been faced with the necessity of going to the expense of finding some concern which had a war contract and making the best sale it could, or of holding its stocks until the emergency was ended, which would mean a tie-up of capital and expense of storage as well as other possible loss and expense. Any just valuation must take into consideration these conditions. Otherwise the owners whose stocks were requisitioned would be put into a preferred classification over concerns whose stocks were not taken, but the disposition of which was necessarily limited by essential wartime restrictions.

It may be added that in May 1945 plaintiff made some war contracts that called for the use of aluminum, which it purchased on priorities at the list price. Plaintiff's vice president testified that had not plaintiff's stocks been theretofore requisitioned it would have used them to fill these war orders.

The plaintiff filed its proof of claim for the sum of $45,145.25 as just compensation for its stocks of aluminum which had been requisitioned.

Defendant made a preliminary determination that fair and just compensation for the property requisitioned was $30,781.83. This was based upon a program price which covered numerous stocks of aluminum, many of which were less costly than the stocks held by plaintiff. This program price was above the scrap value of aluminum, but less than the value of the particular type of aluminum which plaintiff had in its stocks.

Ernest A. Tupper, a witness for the defendant, who was with the War Production Board, had much to do with setting the price to be paid. He testified that he was Vice President of the Gruen Watch Company, but had been in the Government service continuously since 1930. He had a Civil Service rating as an economist. Between 1923 and 1930 he was with Research Facilities doing industrial research, both as a graduate and undergraduate at the University of Pennsylvania. For ten years he had held various full-time positions with the Department of Commerce and in 1941 established the Inventory and Requisitions Branch of the War Production Board. Mr. Tupper discloses that the Agency was not primarily trying to determine the value, but to set a price that would, in the light of the regulations, priorities, and restrictions which had been established by the Government, induce holders of aluminum to voluntarily deliver it to the Government, rather than incur the carry-over, tie-up of stocks, storage charges, obsolescence, and other elements involved in such restrictions, priorities, and limitations. He testified they estimated that in the circumstances, if they offered 75 percent of the market listings, most of the holders would voluntarily part with their stocks rather than face the uncertainties as to market outlets and the duration of the emergency. This, then, seems to have been the basis of the Government's price and offer rather than the value of the commodity as such. The amount offered to plaintiff for its stocks was 71.9 percent of the value as shown by the Alcoa price list.

Upon being advised plaintiff duly transmitted to the War Production Board its objection to said preliminary determination and reiterated its claim which it had previously made for $45,145.25. On October 19, 1942, plaintiff received from the War Production Board copy of Award of Compensation in the amount of $30,791.83. At the same time plaintiff was advised that if the company was not willing to accept that amount as full and complete compensation, the Metals Reserve Company had been authorized to pay 50% of that amount, or $15,395.92. The plaintiff received this amount, but expressly reserved the right to assert a claim for the balance of what it regarded as fair and just compensation for the taking of such property.

The question is what constitutes just and fair compensation for the property taken.

The original cost which the plaintiff had paid was $45,918.07. For a number of years the market price for aluminum was largely governed by the price list of the Aluminum Company of America, which controls a large part of the production of aluminum. From this company most of the users of aluminum secured their supplies. The purchase price which plaintiff had paid for the aluminum was on the basis of the price list which prevailed prior to October 1, 1941. Beginning October 1, 1941, the Aluminum Company of America issued a new price list and this price list was in effect at the time of the taking of the property. According to this new price list the value of the aluminum at the time of the taking was $42,847.18. A stipulation signed by representatives of plaintiff and defendant sets out this sum as the value as shown by this price list. The stipulation, however, does not undertake to determine the actual value at the time of the taking. There is no way of telling the exact market value of the product in the circumstances. The actual value for purposes of just compensation must be found from all the facts and circumstances disclosed by the record in this case.

There can be no doubt of the right of the defendant to limit the sales and use of aluminum. There is, of course, no doubt of its right to requisition aluminum in any

958

form. The exigencies of war place this power beyond question. However, we do not believe the defendant could take bright new aluminum cut for a specific purpose, dump it into box cars with all kinds of less expensive stocks, largely destroy its value due to the form into which it had been processed, and then lump it all off at a general program price that in a large measure disregards its cost, market value, value to plaintiff, and the purposes for which it was assembled and paid for. There must be just compensation on the basis laid down by the authorities. Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463; Seaboard Airline R. Co. v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664; Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; United States v. New River Collieries Co., 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014; Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 44 S.Ct. 471, 68 L.Ed. 934.

In view of all the facts and evidence in the case we find that the amount which should be paid to plaintiff as just compensation for the value of the interest taken at the time it was taken is $36,420.10. This amount should be reduced by the part payment which plaintiff has heretofore received. In fixing this value we have taken into consideration essential wartime priorities, restrictions, and regulations which necessarily affected the value.

The plaintiff is entitled to recover the difference between $36,420.10 and the amount paid, $15,395.92, a net sum of $21,025.18, with interest thereon at the rate of four percent per annum from May 20, 1942, to date of payment, not as interest but as a part of just compensation, together with interest at the same rate on $15,395.92 from May 20, 1942, to October 19, 1942, the date when the Government offer and award was made.

It is so ordered.

WHALEY, Chief Justice, and WHITAKER and LITTLETON, Judges, concur.

MADDEN, Judge, took no part in the decision of this case.

LITTLETON, Judge, dissenting.