## KAISER et al. v. UNITED STATES.
### No. 46121.

Court of Claims.
Feb. 3, 1947.

George D. Zahm, of New York City, for plaintiffs.

Kendall M. Barnes, of New York City, John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and JONES, WHITAKER, LITTLETON, and MADDEN, Judges.

JONES, Judge.

This case involves just compensation for 127,153 pounds of copper and copper base alloy materials owned by plaintiffs and requisitioned by the defendant on June 23, 1943. The stock included brass rods, anodes, stampings and screw machine parts and brass and bronze forgings and castings.

On August 24, 1943, plaintiffs filed a proof of claim with the War Production Board requesting payment in the sum of $44,689.69 as just compensation.

On October 14, 1943, the Board made a preliminary determination of the value of the materials in the sum of $18,922.32 and

on November 16, 1943, made an award of compensation in that amount.

Plaintiffs declined to accept such award as full compensation. On March 2, 1944, they were paid $9,461.16, being one-half the amount of such award, as provided by the Act of October 16, 1941, as amended, 56 Stat. 181.

Plaintiffs sue for the balance of what they claim as just compensation for the materials requisitioned.

In carrying out the National Defense Program, the Office of Production Management, under the authority of the "Priorities and Allocations Act",[1] determined that it was necessary in the public interest and to promote the defense of the United States to conserve the supply and direct the distribution of copper and copper alloy materials. On October 21, 1941, it issued Order M-9-C reducing the use of such materials until the end of the year and prohibiting the use, after January 1, 1942, of copper and copper base alloy in the manufacture of a list of articles classed as relatively nonessential, including all the articles manufactured by plaintiffs. This order did not limit the sale of articles already finished, but only prohibited their manufacture.

In order to accelerate the movement of existing inventories of copper into war production the War Production Board early in 1942 instituted what was termed a Copper Recovery Program. Reports were asked from the many thousands of holders as to their idle or excess inventories of these materials.

Pursuant to their request plaintiffs filed a report. It showed under Part A the products that were still in the form in which they were procured and under Part B the nonassembled, partly or wholly fabricated items.

The Board advised and offered the plaintiffs the program prices that were applicable to their inventory. The plaintiffs wrote a letter accepting this offer on condition that they be allowed to reserve 5,000 pounds of finished packed stock which they claimed should not have been included in their inventory, and, further, that they be allowed

[1] Act of June 28, 1940, 54 Stat. 676, as amended by the Act of May 31, 1941, 55 Stat. 236, 50 U.S.C.A.Appendix, § 1151 et seq.

30 days' additional time to dispose of 1,800 pounds of cast brass anodes.

The defendant replied accepting these conditions. Prior to sending the contract, however, the prices were rechecked by defendant and it was found that some items had been incorrectly priced under the program. The contract as mailed reflected the program prices which were lower than those that the Board had quoted to plaintiffs.

Plaintiffs rejected these prices.

The Copper Recovery Corporation, operating for the War Production Board, acquired 104,873,337 pounds of copper and alloy from 14,277 holders. Roughly, three-fourths of this amount was in primary form and one-fourth semi-fabricated.

The price was described by the Board as a "calculated negotiated price" worked out by the Board after consultation with the copper industry as being the price which would generally have resulted had it been administratively possible to negotiate with each of the many thousands of holders.

Prior to June 23, 1943, the Office of Price Administration had issued price regulations establishing maximum prices on copper scrap or copper alloy scrap and defining scrap, the details being set out in Finding 15.

If sold as scrap on June 23, 1943, plaintiffs' stock would have brought approximately $11,341.68. The actual cost of the materials when purchased by plaintiffs in 1940–41 was $37,587.29.

At the time of the requisition plaintiffs were unable, due to essential war regulations, to use the materials in the manufacture of builders' finishing hardware. There was no limitation upon the sale of completed items but only one of the items requisitioned was completed and ready for sale. Since the stock was only partially fabricated, it could only be used in the manufacture of finishing hardware, which was forbidden by regulations.

Plaintiffs, but for the requisition, could have held the material in stock for use in the manufacture of their products after the emergency had passed and orders and priorities had ended, but this would have entailed capital tie-up, expense of storage and possibly some deterioration and obsolescence. These and other existing factors must be taken into consideration in arriving at the fair and reasonable value of the stock at the time of taking. Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 125, 44 S.Ct. 471, 68 L.Ed. 934; Illinois Pure Aluminum Co. v. United States, 67 F.Supp. 955, 107 Ct.Cl. ——.

In view of the facts, circumstances and evidence, we find the reasonable and fair value of the stocks of plaintiffs requisitioned by the defendant on June 23, 1943, which should be paid to the plaintiffs as just compensation, to be the sum of $28,254.80. A. D. Walker & Co. v. United States, 64 F.Supp. 135, 105 C.Cl. 553, 577.

The plaintiffs are entitled to recover $18,793.64, being the difference between the value as found by us and the part payment heretofore made, with interest thereon at the rate of four percent per annum from June 23, 1943, to date of payment, not as interest, but as a part of just compensation, together with interest on $9,461.16, at the same rate and on the same basis, from June 23, 1943, to March 2, 1944, the date of payment.

It is so ordered.

WHITAKER and LITTLETON, Judges, concur.

MADDEN, Judge (concurring).

If, without any previous orders establishing priorities, and forbidding the further processing of materials on hand, the Government had requisitioned the plaintiffs' stock, it could have said, as it says here, that the only sale value which the stock had, in the condition in which it was taken, was a scrap value. No purchaser could have made any use of it except to remelt it and again fabricate it for his intended use. The more value the plaintiffs had added to it, for their particular use, the less value it would have for anyone else, until the plaintiffs' manufacturing and assembling process was completed. Yet, in such a case, the Government could hardly claim that scrap value was just compensation. The values which the plaintiffs had added to the property for their purposes, by their unfinished fabrication, which values they would realize only when they had completed the process and

sold the product, would have to be included to make the compensation just.

In the case before us, exactly the same elements of value, from the plaintiffs' standpoint, were present when the property was requisitioned, except that the realization of the values, by completion and sale, were to be postponed until the priorities were removed. Considering the relatively small bulk and high value of the material, its slight susceptibility to physical deterioration or to obsolescence, it was not unnatural that the plaintiffs should have decided to hold the property, to realize, when they could, its value. A relatively certain future value, realizable at a future time regarded as certain to come before many years, though uncertain as to when it would come, seems to me to be an element which cannot be discarded in determining just compensation. In fixing upon such a value, realizable only in the future, proper discounts should be made for the costs and risks of holding the property. But the sum arrived at, after such deductions, is not speculative but reasonably certain.

The effect, then, of the wartime restrictions lawfully imposed by the sovereign, was not, as to the kind of material here in question, to depreciate its value by converting it to scrap, but to postpone the realization of its value as building hardware until the restrictions were removed. Since that value can be, and could, at the time of taking, have been, determined without undue speculation, the plaintiffs should receive it.

WHALEY, Chief Justice, took no part in the decision of this case.