NEUMATICOS GOODYEAR S. A. v. UNITED STATES.

No. 46328.

Court of Claims.
Nov. 3, 1947.

of Washington, D. C., and Cahill, Gordon, Zachry & Reindel, of New York City, on the brief), for plaintiff.

Kendall Barnes, of New York City, and Peyton L. Ford, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

WHITAKER, Judge.

Plaintiff is a corporation operating in the Argentine Republic. On January 1, 1942, and January 20, 1942, it had purchased in Ceylon 1,948,459½ pounds of rubber. This was requisitioned by the defendant on July 29, 1942. Plaintiff sues for just compensation.

Plaintiff filed a claim with the Board of Economic Warfare asking compensation of $463,361.19. This was based upon an alleged market value of the rubber of 22½ cents a pound, plus $24,986.72 for marine and war risk insurance, transfer charges in New York harbor, and storage at American Dock Company. The Board of Economic Warfare allowed it the sum of $434,146.14, plus $15,556.90 for delay in payment, computed at 6 percent per annum. On May 4, 1944, there was paid plaintiff the sum of $222,369.25, and there was paid $4,964.54 to the American Dock Company for storage charges. Plaintiff in its petition filed in this court claims $876,806.78 and interest, less the amount already paid it.

The rubber was purchased for shipment from Colombo, Ceylon to Buenos Aires by way of New York. At New York it was to be unloaded and reshipped to Buenos Aires. Upon arrival in this country the goods were stored with the American Dock Company where they remained until requisitioned by the defendant.

When they arrived in New York there was in effect a lawful regulation prohibiting the export of rubber goods from this country, including goods in transit, without a license. When a license was applied for to reship the first lot to arrive, it was denied because contrary to the interest of national defense. The application for the reshipment of the second lot was denied because not in conformity with the export

Daniel James, of New York City (C. A. Failing, of Akron, Ohio, Dennis Lindsay,

control schedules. This application was not renewed. When both shipments arrived in the United States there were also in effect regulations prohibiting buying rubber from anyone other than the Rubber Reserve Company, and prohibiting sales to anyone other than the Rubber Reserve Company.

These were valid regulations, promulgated pursuant to acts of Congress passed in the exercise of the war powers of the Government. Whatever decrease in values may have resulted from the imposition of these restrictions on plaintiff's use and disposition of its property is not compensable. Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736; Omnia Commercial Co., Inc., v. United States, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773; Hallman Brothers v. United States, 68 F. Supp. 204, 107 Ct.Cl. 555; Froemming Bros. Inc., v. United States, 70 F.Supp. 126, 108 Ct.Cl. 193; Gothwaite v. United States, 102 Ct.Cl. 400.

However, plaintiff had the right to retain its rubber until it was requisitioned by the Government, and upon being requisitioned the plaintiff is entitled to recover just compensation for the taking of its property. This compensation, however, is to be determined in the light of the conditions resulting from the imposition of these valid wartime restrictions. Illinois Pure Aluminum Co. v. United States, 67 F.Supp. 955, 107 Ct.Cl. 1, 19; Id., 330 U.S. 834, 67 S. Ct. 965; Seven-Up Bottling Co. v. United States, 68 F.Supp. 735, 107 Ct.Cl. 402, 404, certiorari denied 332 U.S. ——, 68 S.Ct. 56; Kaiser et al. v. United States, 69 F. Supp. 588, 108 Ct.Cl. 47; Pantex Pressing Machine, Inc., v. United States, 71 F.Supp. 859, 108 Ct.Cl. 735.

At the time its property was requisitioned plaintiff had but two options, in view of the restrictions: either it could keep its property until the restrictions had been removed, or it could sell it to the Rubber Reserve Company at 22½ cents a pound. When it was requisitioned the Board of Economic Warfare awarded plaintiff compensation based upon 22½ cents a pound. If this price was reasonable and just under all the circumstances, plaintiff is not entitled to recover, but, of course, if it was inadequate, it would not represent just compensation.

Plaintiff says it was grossly inadequate and it undertakes to support this assertion by two things: first, it says that it was necessary for it to replace the rubber requisitioned, insofar as it could, by purchases made on the Argentine market in the year 1942, and that it had to pay much more than this for it. In the months of August and October it purchased on this market about 150,000 pounds of rubber, for which it paid prices varying from $1.17 to $1.35 a pound. In 1943, it purchased something over 180,000 pounds at $1.03 a pound, and in 1944, it purchased between fifty-five and sixty thousand pounds at prices ranging from 86 cents to $2.21 a pound. It says that under our decision in Felin & Co. v. United States, 67 F.Supp. 1017, 107 Ct.Cl. 155, certiorari granted 330 U.S. 814, 67 S.Ct. 864; it is entitled to this replacement cost; but for some reason it limits its demand to 45 cents a pound, although its replacement cost considerably exceeded this amount.

We are of opinion that plaintiff is not entitled to recover this replacement cost, because the necessity for the replacement of this rubber by purchases on the Argentine market arose from the restrictions placed on the exportation of rubber from this country to Argentina, independent of the requisition of it. These restrictions alone made it necessary for plaintiff to make these purchases on the Argentine market. It would have been necessary for it to do so whether or not the defendant had requisitioned its property. Therefore, it cannot be said that the cost of replacement resulted from the requisition. It resulted rather from the restrictions on exportation, and these restrictions were lawful and do not give rise to a valid claim against the United States. In the Felin case the cost to which the plaintiff was put for the replacement of its property arose alone from the requisition of it by the defendant.

Plaintiff next asserts that 22½ cents does not represent just compensation because at the time regulations were issued prohibiting the sale of rubber to anyone

other than the Rubber Reserve Company, rubber was selling on the open market for 43 cents a pound. There is set out in finding 17 a tabulation showing the sales of Latin American rubber on the New York market from January 2, 1942, through January 31, 1942, the date of the regulations prohibiting sales to anyone other than the Rubber Reserve Company. This tabulation shows that at the time these regulations were promulgated rubber was selling at around 43 cents a pound. This rubber was so-called wild rubber obtained from the jungles of Central and South America, but the proof shows that after it had been washed and dried it was comparable in quality to the rubber requisitioned, although perhaps not quite so good. It was the only rubber available on the open market because in June 1941 the Rubber Reserve Company had entered into an agreement with the rubber-producing countries in the Far East under which it alone could import into this country rubber from this area.

But at the same time this rubber was selling on the open market for 43 cents a pound, rubber could be purchased from the Rubber Reserve Company at prices considerably below those paid on the open market; but it could not be purchased from the Rubber Reserve Company at all except on a permit from this company, which was issued only for certain permitted uses contributing to the prosecution of the war or for essential domestic use. A person not having a permit and wanting rubber was compelled to purchase this Latin American wild rubber at the prices set forth in finding 17.

At the same time that these high prices were being paid for this Latin American rubber one holding a permit could purchase comparable rubber from the Rubber Reserve Company for 22½ cents. During the year 1942 the Rubber Reserve Company sold to permit holders 774,572,227.57 pounds of rubber at this price, with slight variations for differences in grade.

Furthermore, the market on which prices varying from 38 to 43 cents a pound was being paid was not open to plaintiff. The first shipment of its rubber did not arrive in this country until February 13, 1942.

Prior thereto and on January 31, 1942, regulations had been promulgated prohibiting sales of rubber to anyone other than the Rubber Reserve Company. If defendant had not requisitioned plaintiff's rubber plaintiff could not have obtained for it the prices being paid on the market prior to January 31, 1942.

At the same time that these prices were being paid for Latin American wild rubber the Rubber Reserve Company was purchasing rubber in the Far East at an average price of about 19.4 cents a pound. Latin American rubber was sold at so much higher prices because of the greatly increased cost of harvesting it. The rubber in the Far East was grown on plantations and was fairly easy to harvest, whereas the Latin American rubber grew wild in the jungles along the Amazon River in Brazil and in other jungle areas. It was extremely difficult and expensive to market and, hence, higher prices were demanded for it.

Taking all the facts into consideration, we cannot say that the New York market for this Latin American rubber establishes just compensation for plaintiff's rubber.

■ There is one further thing to be taken into consideration: On January 31, 1942, the Rubber Reserve Company put into effect what it called its "Surplus Stocks Program." Under it Rubber Reserve Company offered to purchase surplus and undelivered stocks of rubber at a price equal to the amount that had been paid for the rubber, plus freight, insurance, and warehouse charges. Under this program it purchased during 1942, 52,633,280 pounds of rubber at an average price of approximately 23.3 cents a pound. The record does not show how much plaintiff would be entitled to under this program price, since it does not show the freight on the shipment from Ceylon to New York. The rubber cost it in Ceylon about 20 cents a pound and it shows it incurred expenses, exclusive of freight, of $24,986.72. The record does not show the amount of the freight, but we think plaintiff would be justly compensated if it were paid the average amount paid under this program price, plus a fair mark-up for profit, to which we think it is entitled considering the risk incurred in the purchase and shipment of the rubber.

Plaintiff filed a petition with the Board of Economic Warfare asking to be paid for its rubber at 22½ cents a pound, plus charges connected with its shipment and storage, except freight. Twenty-two and one-half cents a pound is about 2½ cents a pound more than plaintiff paid for the rubber in Ceylon. This, it seems to us, is a fair amount to be added to cost to cover freight and profit.

We are of opinion that $463,361.19 is just compensation, the amount plaintiff claimed in its petition filed with the Board of Economic Warfare. This represents the amount it would be entitled to at the average price paid under the surplus stocks program, plus $9,100.66 for profit. Deducting therefrom the amounts already paid of $227,333.79 leaves a balance due of $236,027.40. In addition to this, plaintiff is entitled to compensation for delay in payment, computed at 4 percent per annum from July 29, 1942, to May 4, 1944, on the above sum of $463,361.19, except for the period from February 24, 1943, to April 21, 1944, and at 4 percent per annum on $236,027.40 from May 4, 1944, to date of payment.

Judgment will be entered in favor of plaintiff against the defendant for $236,027.40, plus interest computed as set out above. It is so ordered.