

51–60 and the other as the Federal Safety Appliance Act, 45 U.S.C.A. §§ 1–46.

The cause was removed to this Court from the State Court upon the petition of the defendant. Removal of plaintiff's cause of action was allowed in contravention of 28 U.S.C.A. § 1445(a) relating to non-removable actions, which provides:

"A civil action in any State court against a railroad or its receivers or trustees, arising under sections 51–60 of Title 45, may not be removed to any district court of the United States."

■■ This section prohibits removal even though there is diversity of citizenship or the action involves a federal question. Great Northern Railway Company v. Alexander, 246 U.S. 276, 38 S.Ct. 237, 62 L.Ed. 713.

Plaintiff's motion to remand must be granted and an appropriate order will be entered herewith.

-------

John R. Lenahan, Scranton, Pa., for plaintiff.

Paul Bedford, Wilkes-Barre, Pa., for defendant.

WATSON, District Judge.

This is a motion by the plaintiff to remand his cause of action against the defendant, The Delaware and Hudson Railroad Corporation, to the Court of Common Pleas of Lackawanna County, where it was instituted.

On August 13, 1953, plaintiff, a trainman employed by the defendant railroad corporation, brought suit in the Court of Common Pleas of Lackawanna County for damages for injuries sustained by him while in the employ of the defendant on December 16, 1952. Suit was brought under two Acts of Congress, one commonly known as the Federal Employers' Liability Act, 45 U.S.C.A. §§

**CALTEX (PHILIPPINES), Inc.**
**v.**
**UNITED STATES.**
No. 48322.

United States Court of Claims.
July 13, 1954.

Leo T. Kissam, New York City, for plaintiff. Albert E. Van Dusen, Henry J. Kiernan, and Joseph M. O'Loughlin, New York City, were on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

Plaintiff sues to recover just compensation for its petroleum products stored at Cebu, Philippine Islands, which it alleges the defendant seized on December 8, 1941, immediately following the attack on the Philippines by Japan.

In November 1941 the Chief Quartermaster of the United States Armed Forces in the Far East, designated as USAFFE, ordered Colonel John D. Cook to proceed to Cebu and there to establish an Advanced Quartermaster Depot, of which he was to take command. This Advanced Depot was established to supply the Philippine Army which was then being mobilized and integrated into the Army of the United States. Colonel Cook proceeded to Cebu as ordered in late November 1941. He returned to Manila for conferences with the Office of the Chief Quartermaster, which were held on December 5, 6, and 7, 1941. He left Manila for Cebu at noon on December 8, 1941, after the Japanese had attacked the Island of Luzon in the Philippines. Cebu is one of the smaller islands of the Philippine archipelago about 350 miles south of Manila.

Upon his arrival in Cebu he called a conference with the representatives of the several oil companies having petroleum products stored at Cebu, including plaintiff, at which he advised them that he was freezing the price of such products at the level of the price being paid for them by the Army at the Manila depot, and that the oil companies would be allowed to dispose of only such amount of their products at Cebu as might be needed for essential public and civilian

operations. A few days later military patrols were placed on their properties.

Thereafter, the oil companies were ordered by Colonel Cook to transfer as much of their petroleum products to various dispersal points designated by him as possible, depending upon the number of oil drums they could secure to hold the oil. The supply of drums was scarce, but the oil companies secured as many of them as they could and removed as much of their petroleum products to the dispersal points indicated as they could find drums to contain them. The last of the products removed in drums was removed some time in March 1942.

For all of the products removed in drums to the dispersal points indicated plaintiff has been paid by the defendant.

In the meantime, plaintiff was permitted to sell its products for essential public and private use, with the approval of the Commander of the Advanced Quartermaster Depot.

Early in the morning of April 10, 1942, the Japanese troops were just offshore of Cebu and preparing to land. Thereupon, in performance of a prearranged plan, Colonel Cook ordered all remaining petroleum products on Cebu destroyed, to prevent them from falling into the hands of the enemy. This was done.

■ For the destruction of plaintiff's petroleum products on Cebu on April 10, 1942, which had not already been taken defendant is not liable. United States v. Caltex (Philippines), Inc., 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157. The case cited involved plaintiff's facilities at Manila and determines the defendant's liability to plaintiff for the destruction of its products at Cebu.

As stated above, for plaintiff's products which were removed to dispersal points under orders of defendant, plaintiff has been paid. Defendant converted to its own use none of plaintiff's products, except those which were removed in drums to the dispersal points.

It follows that defendant is not liable to plaintiff, unless Colonel Cook's actions on December 8, at which time he had exercised control over, and placed restrictions upon, the disposition of plaintiff's properties for the purpose of conserving them for possible use subsequently, amounted to a taking thereof under authority conferred upon him by the defendant, or was an unauthorized taking that was subsequently ratified. If what he did at that time amounted to a taking, and if at that time he was authorized to seize all of plaintiff's products, or if his action was subsequently ratified, defendant would be liable not only for that removed in drums, which has been paid for, but also for all products later disposed of to private persons or other public institutions, less a credit for the amount received for them, and also for that destroyed upon the landing of Japanese forces.

The principal questions, then, are, first, whether or not Colonel Cook did on December 8, 1941, in fact take plaintiff's property for public use; second, whether or not he had authority at that time to take the property; and third, whether or not someone having authority ratified his action if he lacked authority.

■ 1. We do not think what Colonel Cook did on December 8 amounted to a taking of plaintiff's products. What he did at that time amounted to no more than the exercising of reasonable control over, and the placing of reasonable restrictions on the disposition of plaintiff's property, and the price to be obtained therefor, for the purpose of conserving and protecting them for subsequent possible use. This is evidenced by the fact that plaintiff thereafter was permitted to sell its products to private persons or private institutions and to public institutions, and to receive payment therefor, and to put the money into its own treasury, without making any account to the defendant.

It was defendant's intention to appropriate for its own use so much of the products as the oil companies could remove to the designated dispersal points in drums, but it did not intend to appropriate, because it could not use, that part

not so removed. During the four months between Colonel Cook's conference with representatives of the oil companies and the landing of the Japanese on Cebu the defendant used, in fact, only those products that had been removed to the dispersal points.

The Commissioner has found in finding 14 that Colonel Cook told representatives of the oil companies that "he was taking over all of the [oil] supplies, and such of the facilities as were necessary to make use of them; that he was freezing the price at the level of the contract price in Manila depot; and that the oil companies would be allowed to withdraw only such oil as was needed for essential public and civilian operations."

By the expression "taking over" Colonel Cook could have meant only that he was placing controls on these products to conserve them for subsequent use. It did not mean that he was condemning these products for the use of the defendant. His freezing of the price which the oil companies could get for their products is inconsistent with an appropriation of them by defendant. His order permitting the oil companies to sell some of them to public and private institutions is inconsistent with an appropriation of them by defendant. His later use of only that part removed to dispersal points and the use of none other is inconsistent with an appropriation.

The exercise of control over, and the placing of restriction on the disposition of plaintiff's products for the purpose of conserving them did not amount to a taking. Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892; Neumaticos Goodyear, S. A. v. United States, 73 F.Supp. 969, 109 Ct.Cl. 535; Foreign Trade Management Co. v. United States, 74 F.Supp. 552, 109 Ct.Cl. 587; Snyder v. United States, 82 F.Supp. 335, 113 Ct.Cl. 61; St. Regis Paper Co. v. United States, 76 F.Supp. 831, 110 Ct.Cl. 271, certiorari denied 335 U.S. 815, 69 S.Ct. 32, 93 L.Ed. 370.

2. Furthermore, the proof falls far short of establishing authority in Colonel Cook to seize and condemn all of plaintiff's products on December 8, 1941. The extent of the proof is that Colonel Cook was instructed to set up this Advanced Quartermaster Depot in order to supply the units of the Philippine Army located on Cebu and surrounding islands, but the way in which these supplies were to be obtained is not shown.

Colonel Cook in his testimony says that he was instructed to procure supplies "in any manner he saw fit"; but even if we assume that these instructions were sufficiently broad to include the requisitioning of private property, which we do not believe they were, the evidence fails to show that the officer giving such instruction had authority to requisition private property, or the authority to delegate such power. Property is never requisitioned, that is, seized or condemned under the power of eminent domain, where it can be secured by agreement with the owner, unless the exigencies of the case demand it. There is no showing whatever that Colonel Cook undertook to purchase plaintiff's oil stocks, and that plaintiff refused to sell them, and certainly no emergency has been shown to have existed on December 8, 1941, which on that date would have authorized Colonel Cook to seize plaintiff's products, on plaintiff's refusal to sell them.

The authority to take private property for public use must be granted by Congress, either prior to the taking or subsequent thereto by ratification, subject to the exception that a Commander of an Army in the field may do so where the danger that necessitates its taking is immediate and impending and admits of no delay. This subject was discussed somewhat at length by us in the case of Hodges v. United States, 111 F.Supp. 268, 272, 125 Ct.Cl. 405. It appears from the authorities cited in that opinion that a Commander in the field has no authority to take private property for public use unless "its taking is demanded by an emergency, by a danger which is immediate and impending and which will not admit of the delay necessary to secure action by civil authority."

It cannot be said in this case that on December 8, 1941, the danger to American forces in and around Cebu, 350 miles from the point of attack, was so immediate and impending as to admit of no delay. In the absence of such circumstances, express authority for the taking must be shown in the officer who takes. In United States v. North American Co., 253 U.S. 330, 333–334, 40 S.Ct. 518, 520, 64 L.Ed. 935, it appeared that Congress had authorized the Secretary of War to acquire certain property taken by General Randall, the Commander of the Department of Alaska, but it did not appear that the Secretary of War had delegated his authority to General Randall and, therefore, it was held that General Randall's action was unauthorized and, therefore, did not subject the United States to liability therefor. The Supreme Court said:

"* * * But, although Congress may have conferred upon the Executive Department power to take land for a given purpose, the government will not be deemed to have so appropriated private property, merely because some officer thereafter takes possession of it with a view to effectuating the general purpose of Congress. See Ball Engineering Co. v. J. G. White & Co., 250 U.S. 46, 54–57, 39 S.Ct. 393, 63 L.Ed. 835. In order that the government shall be liable it must appear that the officer who has physically taken possession of the property was duly authorized so to do, either directly by Congress or by the official upon whom Congress conferred the power."

Plaintiff is not entitled to recover both on the ground that Colonel Cook's action on December 8, 1941, did not amount to a seizure of plaintiff's property for the use of the defendant, and also on the ground that Colonel Cook is not shown to have had the authority to seize it.

3. The record fails to show that Colonel Cook's action on December 8, 1941, was ratified by anyone having the power to requisition private property for public use.

In the former case in this court of Caltex (Philippines), Inc. v. United States, 100 F.Supp. 970, 120 Ct.Cl. 518, all three oil companies, Caltex, Shell and Standard-Vacuum, sought to recover for the destruction of their facilities at Pandacan on the Island of Luzon, when they were in imminent danger of capture by the Japanese, but the Standard-Vacuum Oil Company sought also to recover for its petroleum stocks on Cebu, which were destroyed under orders of the defendant immediately before the Japanese landed on Cebu. The present plaintiff interposed no such claim, but rested its case alone on the destruction of its facilities at Pandacan. The defendant in its brief relied on its argument in defense of the Pandacan claim to defeat Standard-Vacuum Oil Company's claim with reference to its stocks on Cebu.

The attention of the court was centered on the Pandacan claim; but we did allow recovery for Standard's oil products on Cebu on the theory that there had been a taking of them by Colonel Cook on December 8, 1941. This was in error, and to the extent that the opinion and decision in that case is inconsistent with what we have said above, they are overruled.

Plaintiff's petition must be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.