**ANDERSON, CLAYTON & CO., Inc.**
v.
**UNITED STATES.**

**COLGATE–PALMOLIVE–PEET CO.**
v.
**UNITED STATES.**

Nos. 48313, 48316.

United States Court of Claims.
July 13, 1954.

Martin P. Detels, New York City, for plaintiffs. Abner H. Ferguson, Washington, D. C., Charles W. Harvey and Watters & Donovan, New York City, were on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

The plaintiffs in these actions sue for that part of the cargo on board the steamer John Lykes belonging to each of them, which was unloaded at Cebu, Philippine Islands, in December 1941, and which they allege was taken by defendant.

The John Lykes sailed from San Francisco on November 10, 1941, bound for Shanghai and Manila, in that order. For some unexplained reason the vessel did not stop at Shanghai, but proceeded on to Manila, arriving there on December 4, 1941. Some cargo was discharged there, but, due to a shortage of pier and warehouse facilities, further discharge was ordered by the port authorities to

be discontinued and the vessel was ordered to proceed to Cebu and to discharge there the cargo destined for Shanghai.

The vessel arrived at Cebu on December 7, and between that date and December 12 discharged all her cargo destined for Shanghai except a small amount which was underneath the Manila cargo. On December 13, the Philippine Collector of Customs ordered the John Lykes to discharge the remainder of her cargo at Cebu, and this was done between that date and December 19.

On December 9 Colonel Cook, the Commanding Officer of the Advanced Quartermaster depot at Cebu, directed the agent of Lykes Brothers Steamship Company, which owned the steamer John Lykes, to hold the cargo subject to Army control, and ordered him not to dispose of it without authority from him.

There was insufficient space on the piers at Cebu to store all the cargo unloaded, and for this reason, among others, Colonel Cook and the agent of Lykes Brothers leased all available shelter for the cargo, such as empty warehouses, schools and residences, to which the cargo was removed in Army trucks, which were the only trucks available.

With the exception of foodstuffs in the cargo, no inventory was made of the cargo removed to the places leased, nor was it segregated according to type. An inventory was made of the foodstuffs and these items were retained by the Army for its own use.

On December 24 Colonel Cook installed new locks on the doors of the structures where the cargo was stored and denied the agent of Lykes Brothers free access thereto. He advised the agent that he was taking physical control of the cargo, but he did permit local consignees to remove the parts of the cargo which had been consigned to them.

Although Colonel Cook took physical control of the cargo and denied plaintiff's agent access thereto, he did not intend to requisition the entire cargo, but only to conserve it so that such parts of it as were of military use would be available when needed. At the time he did not know the contents of the cargo, except that he did know that some of it contained items of military value, such as food, clothing, medicines, motorcycles, and refrigerators.

Subsequently, Colonel Cook removed from the places of storage such parts of the cargo as were of military use and appropriated them to the use of the defendant. These items consisted of food, medicines, soap, radios, motorcycles, tobacco, clothing, shoes, refrigerators, alcoholic spirits, and building materials. The balance of the cargo he left in the places where they had been stored under his direction and the direction of the agent of Lykes Brothers.

Included in the cargo of the John Lykes were soap and soap flakes belonging to the plaintiff Colgate-Palmolive-Peet Company. This was appropriated for use by the Army prior to April 10, 1942. Also included in the cargo were 72 bales of cotton consigned by Anderson, Clayton & Company, of Los Angeles, California, to Anderson, Clayton & Company at Shanghai. The defendant had no use for this cotton and did not remove it from the places where the cargo had been originally stored and did not appropriate it to its own use.

On April 9, 1942, Colonel Cook received word that the Japanese forces were in the vicinity of Cebu. They landed on the island of Cebu at 6 a. m. the following day. After having received this word, Colonel Cook opened the places where the cargo was stored and permitted the natives to remove any part thereof which they desired. At 5:15 a. m. on April 10, 1945, forty-five minutes before the Japanese landed on Cebu, Colonel Cook ordered the destruction of all property which was of possible military value to the enemy, including the cargo of the John Lykes which had not been appropriated by the Army.

The principles governing this case are the same as those in the case of Caltex (Philippines), Inc. v. United States, Ct. Cl., 122 F.Supp. 830.

1. Defendant is not liable for the destruction of the cargo to prevent its falling into the hands of the enemy.

2. Colonel Cook did not appropriate to the use of the Army any part of the cargo of the John Lykes which was of no military use. The control exercised by him over the cargo was merely to prevent the dispersal of these products before he had had an opportunity to determine which, if any, were of any use to him in his supply operations. It is true that in doing so, Colonel Cook went to the extent of assuming physical control over the entire cargo and of excluding the agent of the steamship company from access thereto; but, even so, this did not amount to a taking of this cargo for public use. It was not a requisition of it for which the defendant is obliged to pay just compensation, but rather the exercise of reasonable control, under the circumstances, over the products.

Such parts thereof as were of military use Colonel Cook did subsequently in fact appropriate, and under all the circumstances of this case we think there arises an implied promise on the part of defendant to pay for it, since Colonel Cook was given authority to acquire by purchase such materials as were of military value. It is not shown, nor is it asserted, that the owners of the cargo or the master of the vessel were unwilling to turn these articles over to the Army; they acquiesced in the appropriation of them by Colonel Cook. From these circumstances we think an implied contract arose to pay for the articles so appropriated.

3. Colonel Cook is not shown to have had any authority to requisition property, that is to say, to take it for public use, against the will of the owner. The necessity for such authority has been discussed in Caltex (Philippines), Inc. v. United States, supra, and will not be repeated here. Neither express authority, nor authority arising from the exigencies of the case, is shown.

We, therefore, hold that the defendant is liable for all parts of the cargo which it in fact appropriated to its own use, but it is not liable for that part which it did not appropriate to its own use and which was either destroyed when it was in imminent danger of capture by the enemy forces, or which was taken by the native population, with Colonel Cook's permission, when it was in imminent danger of capture by enemy forces.

Plaintiff, Anderson, Clayton & Company, Inc., is not entitled to recover and its petition is dismissed. Plaintiff, Colgate-Palmolive-Peet Company is entitled to recover. Since the cases have been submitted to the court on the question of liability only, judgment is suspended in the case of Colgate-Palmolive-Peet Company until the incoming of a stipulation by the parties, or, in the absence thereof, until the incoming of a report of a commissioner showing the amount due, computed in conformity with this opinion.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.