LaRamoRe, Judge,
delivered the opinion of the court:
Plaintiff sues to recover just compensation for its petroleum products stored at Cebu, Philippine Islands, which it alleges the defendant seized on December 8,1941, immediately following the attack on the Philippine Islands by Japan.
This case first came before the court on the proofs in 120 C. Cls. 518,553, wherein we held that “* * * the Depot Commander [Cebu], with full authority to do so, took Standard’s petroleum products for the United States on December 8, 1941, not for destruction, but for use, and Standard is clearly entitled to just compensation for its products so taken.”
Standard-Vacuum was one of . three plaintiffs which had claims for just compensation for terminal facilities alleged to have been taken in the Pandacan District of Manila, Philippine Islands, and for petroleum products on the Island of Cebu. The court allowed compensation for the terminal facilities destroyed in Pandacan and also for Standard-Vacuum’s petroleum products taken on Cebu. The Pan-dacan claims were appealed by the defendant to the Supreme Court which resulted in a reversal of this court’s decision, 344 U. S. 149. This left plaintiff’s judgment on its Cebu claim standing. Thereafter, and while plaintiff’s claim was pending before a commissioner of this court for a determination of the amount due, the court decided in the case of Caltex (Philippines), Inc. v. United States, 129 C. Cls. 605, cert. denied, 348 U. S. 926, 927, under an identical fact situation that there had been no Fifth Amendment taking of Caltex’s petroleum products on Cebu. The court further held that it was in error on the Cebu claim of Standard-Vacuum and to that extent overruled its previous opinion.
Defendant then moved for a new trial under rule 54 (b) (5) and (6)., In an opinion, 130 C. Cls. 431,433, we granted defendant’s motion for a new trial and set aside the former judgment and held “that Standard-Vacuum Oil-Company is 'not entitled to recover for the" destruction of its petroleum *430 products remaining on Cebu when the Japanese were about to land on April 10, 1942. For all such products which had been appropriated by the defendant to its own use and which have not been paid for, it is entitled to recover.” The case was referred to a commissioner to take proof and report the amount due.
Plaintiff then filed a motion under rule 54 (b) (1) for relief from the above order. The court amended in 130 C. Cls. 434 its reference to the commissioner, using the following language to allow “the taking of any evidence the parties may desire to offer relative to the alleged taking of plaintiff’s oil products on Cebu; otherwise the order of January 11, 1955, [130 C. Cls. 431] will stand.” This motion was granted, by the court for the reason that plaintiff was not a party to the Cebu claim of. Caltex (129 C. Cls. 605) and should, not be bound by the facts developed. in that case. We did this notwithstanding that the facts relative to the oil products of Caltex, Inc. and of Standard-Vacuum Oil Company appeared in all respects to be the same.
A trial was held pursuant to our amended order at which time plaintiff presented no additional evidence but rested on specific portions of the record previously made in the trial of the consolidated case (120 C. Cls. 518). Defendant introduced two witnesses pertaining to. the authority of Colonel. Cook, the Depot Commander at Cebu, who it was alleged had authority to take plaintiff’s property for the use of the Government.
The record now before us on plaintiff’s Cebu claim reveals an identical fact situation as was presented in the Caltex case, which claim wé rejected holding that there had been no taking of Caltex’s petroleum products on Cebu. We so held because “[t]he exercise of control over, and the placing of restriction on the disposition of plaintiff’s products for the pürpose of conserving them did not amount to a taking. Bowles v. Willingham, 321 U. S. 503; Neumaticos Goodyear S. A. v. United States, 109 C. Cls. 535; Foreign Trade Management Company, Inc. v. United States, 109 C. Cls. 587; Snyder v. United States, 113 C. Cls. 61; St. Regis Paper Company v. United States 110 C. Cls. 271, cert. denied 335 U. S. 815.” See also Anderson, Clayton & Company, Inc. v. *431 United States, 129 C. Cls. 347. Plaintiff’s failure to show that its claim is in any material respect distinguishable from Galtex necessarily requires that we dismiss its petition on the ground that there has been no compensable taking of plaintiff’s property by the defendant.
Also, the record reveals that all products which actually were appropriated by defendant for its own use or dispersal have been paid for.
Inasmuch as we find no Fifth Amendment taking, it is unnecessary to discuss the question of Colonel Cook’s authority.
Plaintiff’s petition is dismissed.
It is so ordered.
Pled, Justice (Bet.), sitting by designation; Fahy, Giremt Judge, sitting by designation; Madden, Judge; and Jones, Ohief Judge, concur.
FINDINGS OP PACT
The court, having considered the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
1. Before World War II, plaintiff and three other commercial oil companies maintained terminals in Manila on the Philippine Island of Luzon. The four terminals were adjacent to another in an area known as the Pandacan District. Plaintiff and two of the other companies also owned and operated terminals on the Island of Cebu.
2. (a) Several year prior to 1941, the United States Army, Philippine Department, began developing strategical plans for the defense of the Islands in the event of attack. These plans were incorporated in a formal, written compendium known as the Philippine Department Plan— Orange, which was subject to continual refinement.
(b) The tactics of the Orange Plan, as related to the Island of Luzon, called for defensive action at the- beaches in the event of enemy landings, to be followed by a slow withdrawal-of Army forces to Bataan Peninsula, the defense to continue over a period of 180 days, using personnel and supplies available locally.
*432 (c) In planning for the day of emergency (M-Day in tlie Orange Plan), the Department Quartermaster never acquired or intended to acquire, before M-Day arrived, extensive supplies of petroleum products or extensive facilities for the storage, handling, and distribution of such products. The Quartermaster planning was therefore predicated upon the storage, handling, and distribution facilities and the petroleum stocks of the commercial oil companies operating in Manila.
3. (a) In June 1940, the Commanding General, Philippine Department, held a conference with officers under his command relating to the defense of the Philippines. After this conference, work was begun in earnest upon the 1940 revision of the Orange Plan. Data were obtained from the oil companies as to (1) the nature of their facilities for the storage, handling, and distribution of petroleum products and (2) the amount of such products on hand from time to time. The Department Quartermaster determined that Army personnel would not be available to operate the oil companies’ facilities and that, in the event of emergency, the Army’s chief reliance for petroleum supplies would fall upon the oil companies’ personnel, as well as their stocks and facilities.
(b) At that time and a year later (June 1941) the Army’s needs for petroleum products were obtained from the oil companies, by contract, on a day-to-day call or delivery to the different Army stations throughout the Philippines. This situation continued unchanged into December 1941. The Army had only limited stocks of petroleum products in the nature of a war reserve. The Quartermaster Corps estimated the Army’s need, for 180 days’ defense in the event of hostilities, to be in excess of five million gallons.
4. (a) On July 28,1941, the command known as USAFFE (United States Armed Forces in the Far East) was created, and General Douglas MacArthur was placed in command. The Philippine Department, United States Army, was continued in the echelon of command under Headquarters, USAFFE. The officer who was then Department Quartermaster became Chief Quartermaster, USAFFE.
*433 (b) In November 1941, the Philippine Department was absorbed in the USAFFE Field Service Command. General MacArthur retained command of the Philippine Department Service Command as well as USAFFE.
(c) In November 1941, the Chief Quartermaster, USAFFE, arranged for the dispatch of an officer of the Quartermaster Corps (Colonel Cook) to Cebu to establish and command an advance Quartermaster Depot. Colonel Cook was authorized and directed to procure supplies for USAFFE, including petroleum products, for use in the southern islands of the Philippines, and to exercise his discretion as to the manner of procurement.
(d) Upon investigation Colonel Cook found that USAFFE had no bulk stocks of petroleum products in or near Cebu, and only a negligible amount of petroleum products in drums. It had been determined at USAFFE Headquarters not to send supplies of petroleum products to Cebu from Manila. The only supplies of such products in the Cebu area were those of the oil companies.
5. (a) On December 1, 1941, responsibilities and authority were divided among officers of the Army as hereinafter described.
(b) The Commanding General (MacArthur) retained over-all command of Headquarters, USAFFE, and of the Philippine Department Service Command, United States Army.
(c) The Commanding General’s Chief of Staff was next in authority at Headquarters, USAFFE. (During hostilities he became primarily occupied with tactical operations, while the Deputy Chief of Staff, General Richard J. Marshall, became primarily occupied with logistics.)
(d) The Chief Quartermaster, USAFFE (General Charles C. Drake), was charged with control of the supply and maintenance facilities of the Quartermaster Corps, including staff supervision and inspection.
(e) The administration and operation of the supply and maintenance facilities and the command of the personnel and troops assigned to such facilities were the responsibility of the Philippine Department Service Command Quar *434 termaster, a post retained by General Drake as the former Department Quartermaster.
(f) Colonel Cook, as the Commanding Officer of the Quartermaster Depot at Cebu, was responsible for the procurement of petroleum products intended for use by the Army. In the procurement of such products orders were placed by him or at his discretion with the oil companies for delivery under contract.
6. (a) In the early morning hours of December 8, 1941, Manila time, word reached Manila of the attack on Pearl Harbor. Air raids on the Philippines were begun by the Japanese on the same day.
(b)At that time the authority to make wartime requisitions, in the sense of commandeering either the use or title of private property, resided exclusively in General MacArthur as the Commanding General and Theater Commander. While this authority was subject to delegation by him, no such delegation was made to General Drake at any time.
7. (a) On December 8, 1941, Colonel Cook (Quartermaster Depot Commander at Cebu) called a meeting of representatives of the oil companies and declared (1) that in the name of TTSAFFE he was taking over all their supplies of petroleum products and (2) that he was freezing the price of such products at the current Army contract rate. He further stated that the oil companies would be allowed to take out a certain amount of stock from their terminals for the use of the local government and such civilian agencies as were essential to the economy.
(b) .Within a few days after December 8, 1941, Colonel Cook had established control over the oil companies’ terminals and had placed military patrols. An order was issued by him that no petroleum products should be withdrawn without approval by him or his authorized representative.
(c) Work was begun on the packaging of petroleum products in tins or drums and the removal of such products for use or for dispersal to warehouses and supply dumps for protection against possible enemy bombing. ■
(d) Eecords were maintained of the amounts of petroleum stocks (1) removed and (2) on hand at the terminals. *435 Petroleum products released to civilians or for civilian purposes were recorded as stock credits against the amount initially taken by and for the Army. The oil companies were permitted to charge for the amounts so released at prices obtaining for local civilian use.
(e) During the course of this operation some bills were submitted by plaintiff to the Army for petroleum products removed from its Cebu terminal for use or dispersal by the Army. It is not established by the evidence that any of such bills was or was not paid, although plaintiff was ultimately paid for the petroleum so removed (finding 10 (b)).
8. (a) Four days later, on December 12, 1941, the Army took over the Pandacan terminals. In “taking over”, the Army took control of the operation of supply and distribution of petroleum products from the stocks on hand of the oil companies to the troops in the field on the Island of Luzon. In the exercise of this control the Army used the land, buildings, fixed installations, equipment, containers, rolling stock, and personnel of the oil companies’’ Pandacan terminals. Such use was continued through .December 26, 1941. In the course of the operation the Army acquired for its own use petroleum products and containers belonging to the oil companies in amounts not specified by the evidence. Additional petroleum products in amounts not specified were, in the course of the operation, supplied and distributed for civilian use on orders from civilian agencies to the oil companies.
(b) On December 31, 1941, the Army destroyed the Pan-dacan terminals and all petroleum products remaining therein in order to deny the terminals and products to the enemy.
(c) The Army paid plaintiff and the other oil companies for the petroleum products which were removed and used by the Army and also for the products which were in the Pan-dacan terminals and destroyed at the time of the demolition.
9. (a). After the destruction of the petroleum supplies in Manila on December 31, 1941, the only substantial supplies of such products in the Philippines outside of Bataan and Corregidor were at Cebu. Within a short time the need for further supplies of petroleum products on Corregidor and *436 Bataan became critical, and plans were made for the shipment of such supplies from Cebu.
(b) Early in February 1942, General Drake obtained from Colonel Cook a report on the inventories of the supplies at Cebu and then directed Colonel Cook to ship certain supplies “at once”. Some shipments were attempted. A few got through the blockade.
(c) It is not established by the evidence that the efforts described in the preceding paragraph had any effect on the methods theretofore or thereafter used by Colonel Cook to obtain the supplies at Cebu from their owners.
10. (a) On April 10, 1942, the oil companies’ terminals at Cebu and the petroleum products remaining in them were destroyed by order of Colonel Cook pursuant to a prearranged demolition plan. The demolition was performed to prevent the facilities and supplies from falling into the hands of the enemy. Japanese forces were in the harbor when the demolition occurred, and began their landings on Cebu within hours thereafter.
(b) The Army has paid plaintiff for the petroleum products removed from plaintiff’s Cebu terminal for use or dispersal but has refused to pay for the petroleum products remaining in the terminal and destroyed with it. The products so remaining and so destroyed were on hand at the Cebu terminal when Colonel Cook, on December 8, 1941, “took over” all of plaintiff’s petroleum products in the name of USAFFE.
11. (a) In 1947 plaintiff and two other oil companies filed four suits in this court to recover just compensation for petroleum products and terminal facilities located in the Philippine Islands which were alleged to have been taken by the United States after Pearl Harbor.[1]
(b) Three of the cases (including the instant case) were consolidated for trial. The fourth case was tried separately.[2] In each of the three consolidated cases the major claim was for the terminal facilities at Pandacan. Plain *437 tiff and one of the other companies, however, presented claims for products on the Island of Cebu. The case that was tried separately (Caltex, No. 48322) involved only products on Cebu.
(c) By decision dated November 6, 1951, this court allowed recovery in the consolidated cases by all plaintiffs on all claims.[3] This decision was reversed by the Supreme Court as to the Pandacan claims.[4] Plaintiff’s recovery on its Cebu claim was unaffected.
(d) With respect to plaintiff’s Cebu claim, the opinion of this court contained the following:[5]
* * * The products * * * remaining and * * * destroyed had been on hand on December 8, 1941, at the Opon terminal when the Army Depot Commander requisitioned all of Standard’s petroleum products in the name of USAFFE. * * *
* * * the Quartermaster Corps official at Cebu was given authority in November of 1941 to procure supplies for USAFFE, including petroleum products, in any manner he found expedient. On December 8 the Depot Commander actually requisitioned these products. These facts are found by the Commissioner * * * and were not excepted to by defendant. * * *
The court thereupon concluded that “* * * the Depot Commander, with full authority to do so, took Standard’s petroleum products * * * not for destruction, but for use * * The amount of the recovery was reserved for further proceedings under Pule 38 (c).
(e) On December 29, 1953, evidence was closed in proceedings under Pule 3S (c) for determination of the amount of the recovery. The filing of requested findings was completed on March 25,1954.[6]
(f) On July 13, 1954, the court decided that Caltex was not entitled to recover on its Cebu claim “* * * on the ground that Colonel Cook’s action on December 8, 1941, did not amount to a seizure * * * and also on the ground that *438 Colonel Coot is not shown to have had the authority to seize * * *.”[7] The opinion then referred to the instant claim as follows:
* * * We did allow recovery for Standard’s oil products on Cebu on the theory that there had been a taking of them by Colonel Cook on December 8, 1941. This was in error, and to the extent that the opinion and decision in that case is inconsistent with what we have said above, they are overruled.[8]
(g) On June 7, 1955, the court ordered a new trial in this case “with reference to the alleged taking of plaintiff’s oil products on Cebu,” and broadened the reference to the commissioner “to include the taking of any evidence the parties may desire to offer relative to the alleged taking of plaintiff’s oil products on Cebu * * [9] The new trial was held on April 23,1957.[10]
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.

 The actions were: the instant case, No. 48319; Caltex (Philippines), Inc., Nos. 48322 and 48324; and Shell Company of the Philippine Islands, Ltd., No. 48265.

 This was Caltex, No. 48322.

 120 C. CIS. 518.

 344 U. S. 149.

 120 C. Cls. 518, 552, 553.

 Valuation findings were not made at the time because of the Issues raised In Caltex, No. 48322, then pending. Valuation findings have been omitted here because of the conclusion (which follows from the facts as found) that Colonel Cook lacked authority to requisition (commandeer) the property.

 129 C. Cls. 605, 612.

. Plaintiff timely applied to the court for relief from this judgment on the ground that the facts on which the court relied in Oaltem were not of record in Standard. Defendant, meanwhile, petitioned for a new trial of the instant case on the issue of liability.

 130 C. Cls. 431, 434.

 At the trial plaintiff designated specific portions of the record previously made in the trial of the, consolidated cases, and rested its prima facie case. Defendant presented the testimony of two witnesses: General Marshall, Deputy Chief of Staff, and General Drake, the Quartermaster General. The findings herein (1 through 10) rest on the record so made.