Defendant has filed a counter-claim alleging that its payment to plaintiff for the truck delivered in New York was in error, and that it had made demand for the return of the payment, and that no payment had been made. It, however, does not ask for summary judgment on this claim. Nor do we think it is entitled to summary judgment so long as it retains possession of this truck.

Defendant's motion for summary judgment is granted, and plaintiff's petition is dismissed.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.

---

## HONGKONG & SHANGHAI BANKING CORPORATION
### v.
### The UNITED STATES.
### No. 48331.

United States Court of Claims.
Jan. 31, 1956.

John V. Lovitt, Philadelphia, Pa., for plaintiff. Beechwood & Lovitt, Philadelphia, Pa., were on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

WHITAKER, Judge.

This case is before us on exceptions to the report of the Commissioner and for final decision.

Plaintiff, a corporation of Hongkong, China, sues for the value of 794 boxes of "waste-waste tin plate" which it alleges defendant requisitioned from it some time shortly after December 4, 1941.

The tinplate was a part of the cargo of the *American Leader* which sailed from Baltimore for points in the Far East, including Manila, Philippine Islands, and Hongkong, China. It was consigned to plaintiff in Hongkong.

The vessel stopped en route to the Far East at San Pedro, California, on November 4, 1941. Since war with Japan was then impending, the Navy ordered the vessel to proceed to Honolulu, and there await further orders. The ship's agents in Honolulu later directed it to proceed in convoy to Manila. It arrived in Manila

on December 4. After its arrival, the Port Director, a naval officer, acting under orders of the United States Navy, refused to clear any ships for Chinese ports, war with Japan then being imminent. In this situation the ship's agent at Manila gave orders to the captain of the vessel to discharge its cargo at Manila. This he had a right to do under paragraph 4 of the bill of lading, which provides in part:

"In any situation whatsoever and wheresoever occurring * * *, which in the judgment of the carrier or master might give rise to risk of capture, seizure, detention, damage, delay or disadvantage to or loss of the ship or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to * * * proceed on or continue the voyage or to enter or discharge the goods at the port of discharge, * * * the carrier or master, * * * may discharge the goods into depot, lazaretto, craft or other place; or the ship may proceed or return, directly or indirectly, to or stop at any such port or place whatsoever as the master or the carrier may consider safe or advisable under the circumstances, and discharge the goods, or any part thereof, at any such port or place; * * *."

Whether the ship's agent gave these instructions pursuant to orders of the United States Army or Navy is in dispute, and there is no direct evidence by which we can resolve this dispute. However, certain circumstances shed some light on what may have happened.

The tinplate had some military value, and the Chief Quartermaster at Manila had instructions to seize that part of the cargo of each vessel which had military value, and had posted guards on the piers and at the Customs House for this purpose. Therefore, it is to be presumed that he would have instructed the *American Leader* to discharge any part of its cargo which he thought had sufficient military value, under the circumstances, to justify it. But, on the other hand, the vessel undertook to discharge its entire cargo, and it is unlikely that the Chief Quartermaster would have ordered it to do this, since there was considerable congestion on the piers and the port authorities were undertaking to avoid further congestion, so as to leave room for the receipt of military supplies which were expected. Hence, it is uncertain whether or not the vessel was discharging its cargo, including the tinplate, at the orders of the Chief Quartermaster.

As stated, the "waste-waste tin plate" did have a military value; that is to say it could have been used to make tin cans in which to store gasoline, or food supplies, or it could have been put to other uses of military value, but whether or not it was of sufficient military value for the Quartermaster to order the vessel to discharge it, we do not know. Hence, we cannot be certain that he actually ordered it to be discharged, and then took possession of it.

The fact that this tinplate which was discharged was at the bottom of certain holds in the vessel does not show the Quartermaster ordered its discharge, because the vessel was undertaking to discharge its entire cargo, much of which had no military value. That it was undertaking to discharge its entire cargo is evidenced by the fact that when it was ordered to leave the port the master asked permission to remain a little longer, in order that he might discharge the balance of its cargo. The fact that the master wanted to discharge all of its cargo before leaving indicates that he would have discharged the tinplate whether he had been ordered to do so or not.

After 794 boxes of the tinplate had been unloaded, the Port Director, on December 11, 1941, notified all vessels in the harbor that they could either leave that night and try to reach a safe port, or face the alternative of remaining in the port of Manila indefinitely. It was then that the master of the *American Leader* asked permission to remain until after its cargo was fully discharged; but this permission was denied, and the

vessel proceeded to Australia, where it discharged the balance of the tinplate.

The fact that the vessel was ordered to leave port before all the tinplate had been discharged does not show the port authorities did not want the tinplate, because they may have been more interested in getting the vessel out of the port than they were in getting possession of the tinplate.

Therefore, we cannot determine from the evidence whether or not the Quartermaster ordered the tinplate to be discharged. If he did not, the defendant did not take it, unless it was requisitioned after it had been unloaded.

Late in December of 1941, after the American forces had withdrawn from Manila, the warehouses and piers in the port were thrown open, with permission to the civilian population to remove anything in them they wanted. An attempt was made to destroy the remainder, to prevent it from falling into the hands of the enemy. It is impossible to determine from the evidence whether or not the Army ever appropriated to its own use the tinplate in question, or whether it was removed by civilians, destroyed, or fell into enemy hands. Whether or not the Army did appropriate it, is pure conjecture. If it did not do so, of course the plaintiff is not entitled to recover.

■ If it was destroyed, was removed by civilians, or fell into enemy hands, then plaintiff lost its property through the fortunes of war. Of course the Army is not liable if it destroyed it to prevent it from falling into the hands of the enemy. Caltex (Philippines), Inc., v. United States, 100 F.Supp. 970, 120 Ct.Cl. 518; United States v. Caltex (Philippines), Inc., 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157. Nor is it liable for permitting the civilian population to remove it, to prevent it from falling into enemy hands. Anderson, Clayton & Co., Inc., v. United States, 122 F.Supp. 835, 129 Ct.Cl. 347. If it fell into enemy hands, of course defendant is not liable, unless the defendant had previously appropriated it.

■■ The burden is on the plaintiff to show that the Army did appropriate it to its own use, and the difficulty of carrying that burden is another one of the fortunes of war. We cannot hold the Government liable on the theory of probabilities. We must have some proof either direct or circumstantial to show, not what the Army probably did, but what it actually did.

Plaintiff's case fails for lack of proof. Its petition is dismissed.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.

**ANTHONY M. MEYERSTEIN, Inc.**

v.

**The UNITED STATES.**

No. 49531.

United States Court of Claims.
Jan. 31, 1956.

