## HONGKONG & SHANGHAI BANKING CORPORATION
v.
### The UNITED STATES.
### No. 48334.

United States Court of Claims.
July 12, 1956.

Martin P. Detels, New York City, for plaintiff. Watters & Donovan, Charles W. Harvey and Joseph J. Magrath, 3rd, New York City, were on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Melford O. Cleveland, Wilton, Ala., was on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

Plaintiff, a corporation doing business under the laws of the Crown Colony of Hongkong, seeks just compensation for certain cargo which was unloaded from the vessel Dona Nati at Manila, Philippine Islands, in December 1941.

Although plaintiff's petition enumerates 18 separate lots of cargo for the taking of which just compensation is claimed, the taking of only 2 of these lots is presently before the court for determination. One of the two claims involves 50 drums of petroleum grease, and the other involves 120 reels of galvanized steel wire. Plaintiff has selected these two claims as test cases, and if our decision as to them is against plaintiff, it will be determinative of the other 16 claims.

The vessel Dona Nati arrived in Manila from the United States on December 4, 1941, carrying certain cargo belonging to plaintiff. The vessel immediately began to discharge that part of her cargo which was consigned to Manila and the surrounding area. On or about December 10, three days after the outbreak of

the war with Japan, the Master of the vessel received orders from her owners to discharge all cargo consigned to Hongkong and Shanghai at Manila, and such unloading was commenced. When the Japanese landed on the Island of Luzon on December 12, the Manila office of the owners of The Dona Nati received notice from the United States Navy for the vessel to leave Manila as quickly as possible, in order to save the vessel. She sailed from Manila on December 13, and subsequently arrived at Fremantle, Australia, where she discharged the remainder of her cargo which had not been unloaded at Manila.

On about December 8, 1941, the commanding officer of the Quartermaster Depot at Manila received orders to take charge of all supplies having military value in the Manila Port Terminal Area. In order to carry out these orders, the Army took control of and posted guards over the Port Terminal Area. Nothing could leave the piers without Army permission. After the cargo had been removed from vessels in the harbor, a rapid screening of the unloaded cargoes ensued to determine what materials might be of military use. Property thought to have a possible military value was segregated, and either removed from the Area in military vehicles or placed in dumps within the Area for possible removal later. The property which was thought to have no military use was deposited in a large open storage site adjacent to the piers. In order to keep the piers as clear as possible, the Army urged all local Philippine consignees to remove all property consigned to them which did not have a military use. The proof does not show whether or not plaintiff received notice, or whether or not it sought to remove the cargo consigned to it.

Although the Quartermaster Depot had been instructed to give receipts for property taken, this was not done in all cases, because of the haste and the confusion existing in that area due to the imminent capture of the city by the enemy, and no records are now available which show what property was actually taken.

On December 24, Manila was declared an "open city" and the remaining military units proceeded to evacuate, taking as many supplies with them as deficient transportation facilities permitted. The Army succeeded in removing some military supplies, but estimates vary widely as to what quantity was removed and what quantity was still present when the enemy arrived on about January 2, 1942.

On or about January 1, the piers and warehouses in the Area were thrown open and the civilian population was permitted to remove anything they wished. Efforts were made to destroy what was left to prevent it from falling into enemy hands. The evidence does not reveal whether the petroleum grease and the galvanized steel wire involved in this case were removed by the Army, taken by the civilian population, destroyed, or fell into enemy hands. Nor does it show whether or not it was put with other property thought to have a military value. Indeed, there is no proof as to what standards were used by the Army in classifying property as of military value or as of no military value. We are not told whether the Army set aside only property of evident military value or whether it included all property of any possible military value, or used some intermediate standard. It may be that the enemy was so near the Army did not want to bother with anything except items of undoubted value, or it may have thought it could not remove everything of any value. Nor do we know whether the Army intended to take everything that it set aside. For aught we know, everything of any possible military use was set aside, with the intention of later determining what to take and what not to take. If this was what was done, certainly in view of the imminent capture of the city, the property of unquestioned military value would have been removed first, and that of doubtful value last.

We are not told what sort of property the consignees were permitted to remove. Certainly it does not appear that plaintiff demanded the right to remove this petroleum grease and steel wire and that this permission was refused. It is impossible to say with any degree of certainty what became of plaintiff's property. Plaintiff's whole case rests on conjecture, on what may have happened, or what probably did happen. This does not afford sufficient basis for holding the United States liable.

In Hongkong & Shanghai Banking Corp. v. The United States, Ct.Cl., 137 F. Supp. 425, 427, which was very similar to the present case in many respects, we said:

"The burden is on the plaintiff to show that the Army did appropriate it [the property involved] to its own use, and the difficulty of carrying that burden is another one of the fortunes of war. We cannot hold the Government liable on the theory of probabilities. We must have some proof either direct or circumstantial to show, not what the Army probably did, but what it actually did."

As in the earlier Hongkong case, plaintiff has failed to remove this case from the realm of conjecture, and for such failure its case must fail. Cf. Anderson, Clayton & Co. v. United States, 122 F. Supp. 835, 129 Ct.Cl. 347; Caltex (Philippines), Inc., v. United States, 122 F. Supp. 830, 129 Ct.Cl. 605.

Plaintiff is not entitled to recover just compensation for its petroleum grease and galvanized steel wire since it has failed to establish a taking, and its petition will be dismissed as to such cargo, and also as to the other 16 lots of cargo enumerated in the petition.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.

ALLIED KID COMPANY et al.
v.
The UNITED STATES.
No. 48338.

United States Court of Claims.
July 12, 1956.