Of the 100 trucks in the inventory all but 22 were taken by various Government agencies; but the majority opinion states, "Efforts by Aetna after termination [which was on August 14, 1945] to dispose of the remaining 22 trucks were unsuccessful," and so it was decided to publicly advertise them for sale in selected newspapers. This was done on November 16 and 19, *but no bids for as much as the cost price of $3,264.04 were received.*

Later, however, 4 were sold to the Koppers Company for $3,500 each. This left 18. Plaintiff made several offers for these at less than cost, but, so far as the record shows, no other offers were received until the offer of the Reconstruction Finance Corporation on December 6.

The OPA price was a ceiling price, not a floor price. It set the top limit for what an article could be sold, but there was no assurance that this price could be obtained. In war time, prices were high, but when the war was over, many prices dropped sharply. These trucks must have been the sort of materials that were in great demand during the war, but for which there was not a widespread peacetime use; otherwise better bids for these trucks would have been received.

The Government paid $4,542 each for 78 of these trucks, but was not willing to pay this price for the 22, but finally agreed to pay the invoice price of $3,-264.04 for them. Should we now require it to pay more? Plaintiffs were also willing to pay this price, thinking they could sell them at a profit. It is reasonable to suppose they could have, in view of the Government's purchase of the 78 at $4,542. They should not be deprived of this profit.

A reasonable profit, it would seem, would be from 25 percent to 33⅓ percent. Twenty-five percent would amount to $816; 33⅓ percent, to $1,088. I think just compensation to the plaintiffs would be the average of the two, or $952 per truck. From this is to be deducted the cost of putting the trucks in condition, of $50 per truck, leaving a balance of $902.

On this, of course, plaintiffs are entitled to interest for delay in payment, which should be at four percent per annum.

JONES, Chief Judge, joins in the foregoing dissent.

**APPLETON ELECTRIC COMPANY et al.**

v.

**The UNITED STATES.**

**HONGKONG & SHANGHAI BANKING CORPORATION**

v.

**The UNITED STATES.**

**Nos. 48316, 48317.**

United States Court of Claims.

Oct. 2, 1956.

Martin P. Detels, New York City, for plaintiffs. Watters & Donovan, New York City, Abner H. Ferguson, Washington, D. C., Charles W. Harvey, and Joseph J. Magrath, 3rd, New York City, were on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., for defendant. Melford O. Cleveland, Wilton, Ala., was on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

All of the claims of the ten plaintiffs presently before the court involve cargo unloaded from the steamer John Lykes in Cebu, Philippine Islands, in December 1941.

On September 27, 1948, nine of the plaintiffs filed an amended petition in case No. 48316, along with several other parties, alleging a taking of their property by the defendant. The tenth plaintiff, Hongkong & Shanghai Banking Corporation, filed its petition on December 5, 1947, in case No. 48317, also alleging a taking of its property.

The facts and circumstances giving rise to these claims are set out fully in the court's findings of fact and are also discussed in Anderson, Clayton & Company, Inc., v. United States (Colgate-Palmolive-Peet Company v. United States), 122 F.Supp. 835, 129 Ct.Cl. 347.

Therefore, a brief summary of these facts and circumstances will suffice here.

The John Lykes sailed from San Francisco on November 10, 1941, with cargo destined for Shanghai and Manila, and arrived in Manila on December 4, 1941. Some cargo was unloaded there, but port authorities ordered further discharge to be discontinued and the vessel was ordered to proceed to Cebu and to discharge there her cargo destined for Shanghai.

The vessel arrived at Cebu on December 7, and by December 12 had discharged all of her cargo bound for Shanghai except a small amount which was underneath certain cargo originally destined for Manila. On December 13 the Philippine Collector of Customs ordered The John Lykes to discharge the balance of her cargo at Cebu and this was done by December 19.

On December 9 the agent of Lykes Brothers Steamship Company, which owned the steamer John Lykes, was ordered by Colonel Cook, the Commanding Officer of the Advanced Quartermaster Depot at Cebu, not to dispose of the cargo without authority from him. Colonel Cook and the agent then leased all available shelter for the cargo, such as empty warehouses and schools, and the cargo was moved to such places.

Except for foodstuffs in the cargo, no inventory was made of the cargo removed to the places leased. An inventory was made of the foodstuffs and these items were retained by the Army for its own use.

Although Colonel Cook took physical control of the cargo and denied plaintiff's agent access thereto, he did not intend to requisition or to purchase the entire cargo, but only to conserve it so that such parts of it as were of military use would be available when needed. At the time he did not know the contents of the cargo, except that he did know that some of it contained items of military value.

Subsequently, Colonel Cook removed from the places of storage parts of the cargo that were of military use, and appropriated them to the use of the defend-

ant. These items consisted of food, medicines, soap, radios, mortorcycles, tobacco, clothing, shoes, refrigerators, alcoholic spirits, and building materials. The balance of the cargo was left in the places where it had been stored.

On April 9, 1942, Colonel Cook, after receiving word that the Japanese forces were in the vicinity of Cebu, opened the places where the cargo was stored and permitted the natives to remove any part thereof which they desired. On April 10, 1942, forty-five minutes before the Japanese landed on Cebu, Colonel Cook ordered the destruction of all property which might have been of military value to the enemy, including the part of the cargo of The John Lykes which had not been appropriated by the Army.

The claim of the Colgate-Palmolive-Peet Company, one of the plaintiffs in case No. 48316, was originally considered by this court along with the claim of Anderson, Clayton & Company, Inc., in an opinion reported at 122 F.Supp. 835, 129 Ct.Cl. 347. Anderson, Clayton & Company was seeking just compensation for 72 bales of cotton which had been unloaded from The John Lykes at Cebu, and the Colgate-Palmolive-Peet Company was seeking to recover for certain soap and soap flakes. Both the cotton and soap had been discharged from The John Lykes under the circumstances previously set forth in this opinion.

The court held that since Colonel Cook was given authority to purchase materials of military value, and since it was not shown that the owners of the cargo objected to the appropriation of such property by him, an implied contract arose which bound the defendant to pay for the articles actually appropriated. It was also pointed out that Colonel Cook was not shown to have had authority to take property for a public use under the Government's power of eminent domain. The court, in summarizing its holding, made the following statement in 122 F. Supp. at page 837, 129 Ct.Cl. at page 352,

"We, therefore, hold that the defendant is liable for all parts of the cargo which it in fact appropriated to its own use, but it is not liable for that part which it did not appropriate to its own use and which was either destroyed when it was in imminent danger of capture by the enemy forces, or which was taken by the native population, with Colonel Cook's permission, when it was in imminent danger of capture by enemy forces."

The claim of Anderson, Clayton & Company, Inc., was dismissed because the cotton involved was not removed from its place of storage and appropriated by the Army. It was held that the Colgate-Palmolive-Peet Company was entitled to recover on its claim because the soap involved was appropriated for use by the Army. Since the cases had been submitted to the court on the question of liability only, judgment was suspended in the case of the Colgate-Palmolive-Peet Company pending a report of a commissioner showing the amount due the plaintiff.

As to the Colgate-Palmolive-Peet claim, only the question of the value of the soap and soap flakes involved is now before the court, since the question of liability has been previously determined. As to the claims of the other plaintiffs, both liability and damages, if any, are in issue, except as to the claim of the Hongkong & Shanghai Banking Corporation for newsprint. Only the question of liability is in issue as to the latter claim, since evidence as to the value of the newsprint has not been disclosed.

The question of defendant's liability in all of these claims is controlled by the principles set forth in Anderson, Clayton & Company, Inc., v. United States (Colgate-Palmolive-Peet Company v. United States), supra. For convenience, all claims will be discussed under the name of the plaintiff filing the claim. Since the plaintiffs are entitled to recover, if at all, on the theory of implied contract, none of the claims will bear interest.

### Claim of Colgate-Palmolive-Peet Company

Only the question of the amount due the Colgate-Palmolive-Peet Company for its soap and soap flakes is now before

the court since the defendant has previously been held liable on this claim.

On November 6, 1941, the Colgate parent company in the United States invoiced the Colgate branch company in Manila, Philippine Islands, for 638 boxes of soap and soap flakes. The total CIF invoice price for all of the soap and soap flakes was $6,007.87.

On that same date the American President Lines, as agents for Lykes Bros. Steamship Company, Inc., issued a bill of lading evidencing the receipt of the above merchandise for shipment to Manila on The John Lykes. However, plaintiff was subsequently informed by letter from the American President Lines that only 338 boxes of the total of 638 boxes were in fact loaded on The John Lykes, and that the remaining 300 boxes had been loaded on another vessel at San Francisco and ultimately discharged in Australia. The 338 boxes loaded on The John Lykes were discharged at Cebu and appropriated by the defendant, and it is the value of this merchandise that plaintiff is entitled to recover.

The Australian Government notified plaintiff that all of the 638 boxes of soap and soap flakes listed in the invoices had been unloaded in Australia except 239 boxes of Palmolive soap and 100 boxes of Peet soap. One box was apparently lost or appropriated in transit to Australia. Plaintiff later received $3,133.52 from the Australian Government as payment for the 299 boxes of soap and soap flakes unloaded in Australia. This figure was the approximate CIF invoice price at Manila for the 299 boxes unloaded in Australia, although there appears to have been a slight mathematical error in the computation of the figure.

The CIF invoice price at Manila of the 338 boxes of soap unloaded at Cebu was approximately $2,864.23, while the original invoice price, without freight, insurance, and other incidental costs, was $2,301.26. There is no evidence in the record as to the value of the soap products discharged at Cebu, other than the invoice prices and the amount paid the plaintiff by the Australian Government.

Since there was no agreement on the price to be paid for the goods taken, we must determine the fair price of them, for, we think, the defendant impliedly agreed to pay that price when it took the goods. We are faced with a complex and troublesome problem in attempting to ascertain the fair value of the goods at the time the implied contract arose. Generally, when goods are appropriated the price to be paid is the market value of the goods. However, in the present cases there is no evidence as to sales of similar goods at the time of the appropriation and also there is absolutely no evidence as to what a willing buyer would have paid for plaintiff's soap, had such a buyer existed. The only evidence before us is the invoice value of the soap.

Defendant says that the goods were of little or no value when appropriated because of the chaotic condition then existing. Plaintiff, on the other hand, says that since wartime conditions generally raise prices, the value of the goods was probably a good deal higher than the invoice price. There is no real evidence to support either of these views and the court will not indulge in groundless speculation. Since the only evidence as to the value of the soap is the invoice price, we believe it is reasonable to assume that defendant agreed to pay this price.

Defendant objects to the use of the CIF invoice price because it includes freight, insurance, and other charges. However, we believe it is reasonable to assume that if plaintiff had been able to sell its soap at the time of the appropriation by defendant, the sales price would have included such charges. It is also noted that the invoices were CIF at Manila, while the goods were appropriated at Cebu. It is true that the freight and other charges from the United States to Cebu might have varied somewhat from such charges from the United States to Manila, but there is no evidence in the record as to what this variation would have been. In view of the evidence before us, we believe that the CIF invoice price at Manila is the best and most re-

alistic indication of the value of the soap appropriated by the defendant at Cebu, and it must be assumed defendant agreed to pay this amount.

The total CIF invoice price of the 338 boxes of soap appropriated by the defendant was approximately $2,864.23, and plaintiff is entitled to recover this amount.

### Appleton Electric Company

■■ The plaintiff company sues to recover the value of 59 packages of iron conduit fittings which it shipped to Manila aboard The John Lykes in 1941. The conduit fittings were unloaded at Cebu in December 1941, under the circumstances previously described in this opinion.

Plaintiff is entitled to recover if Colonel Cook removed the conduit fittings from their place of storage at Cebu and appropriated them for the Army. If he removed them, an implied contract arose at that time, and whether or not they were ultimately used by the Army is of no consequence. If he did not remove them, then no implied contract arose and the defendant is not liable. Although there is no direct evidence as to whether or not the iron conduit fittings in question were actually removed from their place of storage, we feel that plaintiff has presented sufficient circumstantial evidence to establish that this is what was done.

The evidence reveals that considerable construction work was being done by the Army in the southern Philippine Islands during the time pertinent to this claim. Colonel Cook testified that many items of construction material unloaded from The John Lykes were used in connection with this work, although he was unable to list the specific items used.

We are of opinion that the plaintiff has removed its case from the realm of conjecture which was fatal to the plaintiff in Hongkong & Shanghai Banking Corporation v. United States, Ct.Cl.1956, 137 F.Supp. 425. In the instant case there is evidence that many items of construction materials from The John Lykes were actually removed and used by the Army. We believe that this evidence is sufficient to raise a presumption that plaintiff's property was used or at least removed from its place of storage by the Army, and since the defendant has presented no evidence to rebut this presumption, plaintiff is entitled to recover.

The total CIF Manila invoice price of the iron conduit fittings was $699.65, and for the reasons set forth in the foregoing discussion of the claim of the Colgate-Palmolive-Peet Company, plaintiff is entitled to recover this amount.

### Balatoc Mining Company

The plaintiff company sues to recover the value of 35 steel plates of various sizes which were shipped to Manila aboard The John Lykes in 1941. The steel plates were unloaded at Cebu in December 1941, under the circumstances previously discussed in this opinion.

■ The steel plates in suit fall within the building material category and, for the reasons set forth in the foregoing discussion of the Appleton claim, plaintiff is entitled to recover the value of its property.

On November 4, 1941, A. M. Castle & Company of Chicago invoiced the plaintiff in the amount of $2,794.24 for the 35 steel plates. Balatoc paid the invoice price, plus $471.62 for ocean freight and other shipping expenses, making a total of $3,265.86 expended by it. Plaintiff may have received a small discount in the invoice price for timely payment, but this is not clear from the record. There is no other evidence as to the value of the steel plates.

For reasons stated in the discussion of the Colgate-Palmolive-Peet claim, supra, we believe it is proper to use the invoice price, plus ocean freight and other shipping expenses, as the fair value of the goods at the time of their appropriation. Plaintiff is entitled to recover $3,265.86.

### Benguet Consolidated Mining Company

■ The plaintiff company seeks to recover the value of a quantity of iron.

conduit pipe, 16 steel plates of various sizes, and a quantity of colored rags, all of which were shipped to Manila aboard The John Lykes in 1941. All three of these items were unloaded at Cebu in December 1941, under the circumstances previously described in this opinion.

The plaintiff is entitled to recover the value of the iron conduit pipe and steel plates, both of which are construction materials, for the reasons stated in the discussion of the Appleton Electric Company claim, supra.

On October 31, 1941, the Graybar Electric Company, Inc., invoiced the plaintiff for the iron conduit pipe involved herein. The total invoice price was $709.50, and there was an additional $72.32 for ocean freight, handling, and toll charges to Manila. The evidence does not clearly establish whether or not the plaintiff paid for the invoiced pipe, but since it has been established that it paid the $72.32 for ocean freight and other charges, and since it has been reimbursed for the loss of the pipe by the Continental Insurance Company, it is reasonable to conclude that it did in fact pay for the pipe. There is no evidence as to whether or not the plaintiff received a discount when it paid for the pipe, and there is no other evidence in the record as to the value of the iron conduit pipe.

For the reasons set out in the discussion of the Colgate-Palmolive-Peet claim, supra, we believe that plaintiff is entitled to recover $709.50, the invoice price of the pipe, plus $72.32 for frieght and other charges, or a total of $781.82.

On November 3, 1941, A. M. Castle & Company invoiced the plaintiff for the 16 steel plates involved herein. The total invoice price of the plates was $1,609.33 and shipping charges amounted to $327.-86. Plaintiff paid the invoice price and shipping charges on November 11, 1941. There is no other evidence in the record as to the value of the plates at the time they were appropriated.

For the reasons set out in the discussion of the Colgate-Palmolive-Peet claim, supra, the plaintiff is entitled to recover $1,609.33, the invoice price of the steel plates, plus $327.86 for shipping charges, or a total of $1,937.19.

The colored rags in suit were shipped aboard The John Lykes along with a quantity of cotton waste material and were unloaded at Cebu. The Army had use for the rags and appropriated them prior to April 10, 1941, and plaintiff is entitled to recover their value. The plaintiff does not ask compensation for the waste materials and it is unnecessary to determine whether or not this material was appropriated by the Army.

On October 31, 1941, C. J. Hendry Company invoiced the plaintiff for the colored rags. The invoice price of the rags was $270, and the shipping charges were $27.70. Plaintiff paid both the invoice price and the shipping charges. There is no other evidence in the record as to the value of the rags.

For the reasons set out in the discussion of the Colgate-Palmolive-Peet claim, supra, the plaintiff is entitled to recover $270, the invoice price of the rags, plus $27.70 for shipping charges, or a total of $297.70.

### J. P. Heilbronn Company, Inc.

The plaintiff company sues to recover the value of a quantity of roofing materials and fixtures which were shipped to Manila aboard The John Lykes in 1941, and unloaded at Cebu in December of that year under the circumstances previously discussed in this opinion.

On October 27, 1941, The Paraffine Companies, Inc., of San Francisco, invoiced the plaintiff for the roofing materials and fixtures involved herein. The invoice price was $918, and the prepaid freight charges to Manila were $556.05. Plaintiff paid the invoice price, less a small discount, and also the shipping charges.

The agents of The John Lykes at San Francisco issued to The Paraffine Companies, Inc., a bill of lading for shipment of the materials which named The Paraffine Companies, Inc., as the shipper, and also as the consignee in Manila. The bill of lading was stamped to indicate

that payment had been made by the J. P. Heilbronn Company, and carried instructions that the Heilbronn Company should be notified when the property arrived in Manila.

The defendant contends that since The Paraffine Companies, Inc., was named as consignee in the bill of lading, it, and not the plaintiff, is the owner of the claim under consideration. We cannot agree with this contention. The plaintiff paid the invoice price and the shipping charges, the plaintiff was to be notified upon the arrival of the materials in Manila, and the plaintiff had been reimbursed for the loss of the materials by the Fireman's Fund Insurance Company. We think that these factors are sufficient to establish plaintiff's ownership of the claim.

Since the roofing materials and fixtures in suit fall within the building material category, plaintiff is entitled to recover on its claim for the reasons set out in the discussion of the Appleton claim, supra.

There is no evidence in the record as to the value of the roofing materials and fixtures other than the invoice price and the shipping costs.

For the reasons set out in the discussion of the Colgate-Palmolive-Peet claim, supra, the plaintiff is entitled to recover $918, the invoice price of the roofing materials and fixtures, and $556.05 for shipping charges, or a total of $1,474.05.

### Huth & James Shoe Company

■ The plaintiff company sues to recover the value of a quantity of shoes which were shipped to Manila aboard The John Lykes and unloaded at Cebu in December 1941 under the circumstances previously set out in this opinion.

On October 24, 1941, the plaintiff invoiced the Hamilton Brown Shoe Company of Manila for the shoes herein involved. The invoice price was $218, and the cost of shipping the merchandise to Manila was $28.14. There is no evidence that the Hamilton Brown Shoe Company ever paid the plaintiff for the shoes or for the shipping charges, and the plain-

tiff has been reimbursed for the loss of the shoes by the American Insurance Company.

The Army had use for the shoes and appropriated them prior to April 10, 1941, and the plaintiff is entitled to recover their value at the time they were appropriated.

There is no evidence in the record as to the value of the shoes other than the invoice price and the shipping costs.

For the reasons set out in the discussion of the Colgate-Palmolive-Peet claim, supra, the plaintiff is entitled to recover $218, the invoice price of the shoes, plus $28.14 for shipping charges, or a total of $246.14.

### Nederlandsche Handel-Maatschappij, N. V.

■ The plaintiff company sues to recover the value of a quantity of dried shrimp that was shipped to Shanghai aboard The John Lykes in 1941 and unloaded at Cebu in December of that year under the circumstances previously set out in this opinion.

On November 7, 1941, The Trans-Pacific Company of San Francisco invoiced the Pao Lai Trading Company of Shanghai for the dried shrimp involved herein. The CIF Shanghai price was $5,870.78.

Plaintiff's Shanghai office established a letter of credit for the account of the Pao Lai Trading Company with The Trans-Pacific Company named as beneficiary in the letter, and the Wells Fargo Bank in San Francisco was advised of the letter of credit.

On November 9, 1941, The Trans-Pacific Company drew its sight drafts, without recourse, in the total amount of $5,870.78 on the Pao Lai Trading Company, and presented them to the Wells Fargo Bank, together with attached duplicate signed invoices, two original ocean bills of lading, and insurance papers. On November 9, 1941, the Wells Fargo Bank paid to The Trans-Pacific Company $5,870.78 and received from the latter the drafts and attached papers.

Wells Fargo Bank subsequently forwarded the bills of lading to the New

York office of the plaintiff, and the plaintiff paid the Wells Fargo Bank $5,870.78.

After the dried shrimp was unloaded at Cebu, the Army appropriated it and used it prior to April 10, 1942, and the plaintiff is entitled to recover its value. The only evidence in the record as to the value of the shrimp is the CIF Shanghai price. There is no evidence as to what the CIF Cebu invoice value would have been.

The total CIF Shanghai invoice price of the shrimp was $5,870.78, and for reasons stated in the discussion of the Colgate-Palmolive-Peet claim, supra, we think that this figure is the best and most realistic indication of the value of the shrimp when appropriated at Cebu.

Plaintiff is entitled to recover $5,870.78.

Philippine American Drug Company

■ The plaintiff company sues to recover the value of a physician's complete laboratory set consisting of drugs, medicines, and chemicals. The set was shipped to Manila aboard The John Lykes in 1941, and unloaded at Cebu in December of that year under the circumstances previously discussed in this opinion.

On October 24, 1941, A. S. Aloe Company of St. Louis invoiced the plaintiff for the laboratory set herein involved. The invoice price was $135.93, and plaintiff was also billed $14.80 for transportation of the merchandise from St. Louis to Manila. Plaintiff paid the freight charges and it is reasonable to conclude that it also paid for the merchandise at the invoice price. Plaintiff was subsequently reimbursed for the loss of the laboratory set by the Fireman's Fund Insurance Company.

The Army appropriated the laboratory set prior to April 10, 1942, and the plaintiff is entitled to recover its value.

There is no evidence in the record as to the value of the laboratory set other than the invoice price and the shipping costs.

For the reasons set out in the discussion of the Colgate-Palmolive-Peet claim, supra, the plaintiff is entitled to recover $135.93, the invoice price of the merchandise, plus $14.80 for shipping charges, or a total of $150.73.

Wood & Selick, Inc.

■ The plaintiff company sues to recover the value of a quantity of paper bags, wrapping paper, and bag closing materials. These items were shipped to Manila aboard The John Lykes in 1941, and were unloaded at Cebu in December of that year under the circumstances previously discussed in this opinion.

The defendant says that the plaintiff is not the owner of the claim and is not entitled to sue in this court. We cannot agree with the defendant's contention.

On October 24, 1941, Bagpac, Inc., of New York City, invoiced the plaintiff for the merchandise herein involved and for transportation charges from New Orleans to Manila. The invoice contained instructions to ship the merchandise to Red V Coconut Products, Ltd. (hereinafter referred to as "Red V"), which was a manufacturer of desiccated coconut in the Philippines. The paper bags and other merchandise in question were to be packed by Red V with desiccated coconut and shipped to plaintiff, which acted as Red V's exclusive selling agent in the United States. On October 30, 1941, the plaintiff paid the total invoice price of $7,660.74, which included transportation charges, and charged it against an account on its books representing balances due Red V. However, plaintiff did not invoice the materials to Red V.

The materials were shipped to Manila on The John Lykes on a bill of lading which named Bagpac, Inc., as shipper and Red V as consignee.

It is true that the fact that Red V was named as consignee in the bill of lading raises a presumption that it was the owner of the merchandise, rather than plaintiff. Furthermore, the fact that the plaintiff charged an account due Red V when it paid for the merchandise indicates that Red V was the true purchaser, and that plaintiff was merely acting on its behalf. On the other hand, however, plaintiff paid for the merchandise and did not bill

Red V, and Red V filed a formal disclaimer of any interest in the materials. Plaintiff insured the property and has been reimbursed for its loss. We believe that these factors rebut the presumption that Red V is the owner of the claim and establish the plaintiff as the owner. It is particularly significant that plaintiff, and not Red V, bore the risk of loss in transit and insured the merchandise against such loss. This strongly indicates that it was the intention of the parties that title was not to pass from the plaintiff to Red V until delivery of the goods to Red V in Manila.

After considering all evidence in the record, we believe that the plaintiff is the owner of the claim and is entitled to sue in this court.

After the merchandise was unloaded at Cebu, it was appropriated by the Army prior to April 10, 1942, and plaintiff is entitled to recover its value. There is no evidence in the record as to the value of the paper bags, wrapping paper, and bag closing materials, other than the invoice price and transportation charges.

For the reasons set out in the discussion of the Colgate-Palmolive-Peet claim, supra, plaintiff is entitled to recover $7,660.74, which includes the invoice price, plus transportation charges.

### Hongkong & Shanghai Banking Corporation No. 48317

█ The plaintiff corporation sues to recover the value of a quantity of glucose and a number of rolls of newsprint, both of which were shipped to Manila aboard The John Lykes in 1941, and unloaded at Cebu in December of that year under the circumstances previously discussed in this opinion.

In 1941 Otis McAllister & Company of San Francisco, sold the glucose herein involved to Frost Bland and Company of Shanghai, China, for $1,707.75, CIF Shanghai, plus a war risk insurance charge of $25.88, or a total of $1,733.63. McAllister drew a ninety-day sight draft of $1,733.63 on Frost Bland and presented it for payment to the plaintiff banking corporation's San Francisco agency, together with a properly endorsed bill of lading and other documents. The plaintiff's San Francisco agency paid McAllister the amount of the draft under a letter of credit which had been issued and submitted to the San Francisco agency by plaintiff's home office in Shanghai. On November 29, 1941, plaintiff's San Francisco agency forwarded the draft and attached documents by air mail to plaintiff's home office in Shanghai for collection from Frost Bland. The draft and attached documents disappeared and it cannot be determined whether they ever arrived in Shanghai, or, if they did, whether war conditions prevented the draft from being presented for payment to, or paid by, the purchaser. It is reasonable to conclude that the amount of the draft was not collected from Frost Bland.

After the glucose was unloaded at Cebu, it was appropriated for use by the Army prior to April 10, 1942, and the plaintiff is entitled to recover its value at the time of the appropriation.

There is no evidence in the record as to the value of the glucose other than the CIF Shanghai price and the war risk insurance charge.

For reasons stated in the discussion of the Colgate-Palmolive-Peet claim, supra, plaintiff is entitled to recover $1,707.75, the CIF Shanghai price, plus $25.88 for war risk insurance, or a total of $1,733.63.

█ The newsprint in question was taken to places of storage in Cebu along with other items of cargo from The John Lykes. Prior to April 10, 1942, an undetermined quantity of the newsprint was either delivered to two newspapers in the Cebu area, or they were permitted to remove it. The newspapers used this newsprint in order to continue operating. The newsprint not used by the newspapers was destroyed to prevent it from falling into enemy hands. The Army itself had no use for any of the newsprint.

Plaintiff says that by permitting the local newspapers to use the newsprint, the Army appropriated it to its own use and is therefore liable under the theory

of implied contract to pay for the newsprint used. We cannot accept this view.

Colonel Cook is not shown to have had authority to take property for a public use. He did have authority to acquire by purchase such materials as were of military value. However, it does not appear from the evidence that the newsprint in question had any real military value or that the newsprint was ever appropriated for use by the Army. The circumstances surrounding the use of the newsprint by the newspapers are not clear from the evidence and it is not shown that the newspapers were being operated by or for the Army.

We believe that the evidence fails to establish any implied contract between the plaintiff and the defendant as to the newsprint, and plaintiff is not entitled to recover on this claim.

The plaintiffs in cases Nos. 48316 and 48317 are entitled to recover pursuant to the court's conclusion of law.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.

Dusian Alfred KRIVOSKI

v.

The UNITED STATES.

No. 234-52.

United States Court of Claims.

Oct. 2, 1956.

Writ of Certiorari Denied

Dec. 17, 1956.

See 77 S.Ct. 326.

Frederick Bernays Wiener, Washington, D. C., for plaintiff.

Francis X. Daly, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.